872 So.2d 101 (2003)
Paul L. SPAIN, as administrator for the estate of Carolyn Watts Spain, deceased
v.
BROWN & WILLIAMSON TOBACCO CORPORATION et al.
1000143.
Supreme Court of Alabama.
June 30, 2003.
Rehearing Denied August 29, 2003.
*102 M. Clay Ragsdale of Ragsdale & Wheeler, LLC, Birmingham, for plaintiff.
Vernon L. Wells II and Randall D. Quarles of Walston, Wells, Anderson & Bains, LLP, Birmingham; David S. Eggert and Heather A. Pigman of Arnold & Porter, Washington, D.C.; and Stephen E. Scheve, Steven R. Selsberg, and Peter M. Henk of Shook, Hardy & Bacon, L.L.P., Houston, Texas, for defendant Philip Morris Incorporated.
Samuel H. Franklin, William H. Brooks, and Stephen J. Rowe of Lightfoot, Franklin & White, L.L.C., Birmingham; Richard G. Stuhan, Paul D. Koethe, and Steven N. Geise of Jones, Day, Reavis & Pogue, Cleveland, Ohio; and Mark C. Cawley of Jones, Day, Reavis & Pogue, Washington, D.C., for defendant R.J. Reynolds Tobacco Company.
H. Thomas Wells, Jr., and William B. Wahlheim, Jr., of Maynard, Cooper & Gale, P.C., Birmingham; and Gordon A. Smith, W. Randall Bassett, and Daniel A. Hillman of King & Spalding, Atlanta, *103 Georgia, for defendant Brown & Williamson Tobacco Company (individually and as successor by merger to the American Tobacco Company).
Ross Diamond III of Diamond, Hasser & Frost, Mobile; and Jere L. Beasley and R. Graham Esdale, Jr., of Beasley, Allen, Crow, Methvin, Portis & Miles, P.C., Montgomery, for amicus curiae Brenda D. Tillman, as administratrix of the estate of Kalen O. Tillman, deceased, in support of the plaintiff.
David G. Wirtes, Jr., of Cunningham, Bounds, Yance, Crowder & Brown, LLC, Mobile, for amicus curiae Alabama Trial Lawyers Association, in support of the plaintiff.
Allison L. Alford and Emily C. Marks of Ball, Ball, Matthews & Novak, P.A., Montgomery, for amicus curiae Alabama Defense Lawyers Association.
PER CURIAM.
Carolyn Watts Spain ("Carolyn") was a cigarette smoker during most of her lifetime. After her death, her husband, Paul L. Spain ("Spain"), as administrator for Carolyn's estate, filed a wrongful-death action in the Jefferson Circuit Court against Brown & Williamson Tobacco Corporation; Philip Morris, Inc. (now Philip Morris USA Inc.);[1] and R.J. Reynolds Tobacco Corporation (hereinafter referred to collectively as "the manufacturers"), alleging negligence, wantonness, breach of warranty, conspiracy, and liability under the Alabama Extended Manufacturer's Liability Doctrine ("the AEMLD"). Following the removal of the case to the United States District Court for the Northern District of Alabama, the manufacturers moved to dismiss the complaint for failure to state a claim upon which relief could be granted. The federal district court granted the motion, and Spain appealed to the United States Court of Appeals for the Eleventh Circuit. The Eleventh Circuit certified to us the following questions of state law pursuant to Rule 18, Ala. R.App. P.:[2]
"1. When does the Alabama statute of limitations for claims brought under the AEMLD, and claims premised on negligence, wantonness, breach of warranty and conspiracy begin to run in a smoking products liability case?
"2. Does the Alabama rule of repose apply in a smoking products liability case?
"3. If so, when does the Alabama rule of repose begin to run in a smoking products liability case?
"4. Before the appearance of federally mandated warning labels on cigarettes packages, were cigarettes `unreasonably dangerous' under the AEMLD?
"5. Since the appearance of federally mandated warning labels on cigarettes packages, have cigarettes been `unreasonably dangerous' under the AEMLD?
"In addition to certifying the preceding questions to the Alabama Supreme Court, we also invite that Court to tell us if the conclusions we have reached about the following state law issues are incorrect:
"a. that the negligence and wantonness claims merge into an AEMLD claim;
"b. that the sale of cigarettes does not violate the implied warranty of merchantability *104 under Code of Alabama 1975, § 7-2-314;
"c. that the fraudulent suppression claim, which is a basis for Spain's conspiracy claim, is not viable under Alabama law; and
"d. that, if cigarettes are not unreasonably dangerous as a matter of Alabama law, the fraudulent misrepresentation claim, which is a basis for the conspiracy claim, is not viable under Alabama law."
Spain v. Brown & Williamson Tobacco Corp., 230 F.3d 1300, 1312 (11th Cir.2000).
We begin with a few observations about this Court's response to a certified question from federal courts. This Court's promulgation of the rule that enables a federal court to seek assistance in ascertaining answers to unsettled questions of state law stands as a salutary example of cooperation between federal and state governments. But the practice is not without its limitations. When this Court, as is the case with any appellate court, decides questions presented on an appeal in which numerous issues are argued, the resolution of one or more of the questions presented quite often pretermits the necessity for considering the remaining issues. Sound considerations of judicial policy dictate resolution of only those questions necessary to a decision, without the inclusion of dicta. However, when a federal court certifies questions to us, quite understandably, it often tenders a variety of questions so that it will have ready answers to all questions before it in the event its further analysis of the record renders answers to some of the questions not useful, while the answer to one or more of the remaining questions might dispose of the appeal. Consequently, certified questions can present tension between the legitimate, yet competing, interests of this Court in avoiding answering questions not necessary to a decision and the interests of a federal court needing assistance in dealing with uncharted areas of state law.
A second consideration relates to the maxim often attributed to Albert J. Farrah, a former dean of the University of Alabama School of Law, who reportedly drilled into his students, "Out of facts the law arises."[3] This Court permits a state trial court to certify to it controlling questions of law as to which there is substantial basis for difference of opinion. See Rule 5, Ala. R.App. P. We routinely decline to accept a Rule 5 petition when it appears that as yet undeveloped factual issues are essential to a determination of an abstractly presented question of law. However, quite often when asked to respond to a certified question from a federal court, in the interest of comity we put aside concerns as to unknown or uncertain facts that might affect our answer so as to assist the federal court in answering a question of state law. If the same questions were certified to us by a state trial court pursuant to Rule 5, we would decline to answer them based upon the presence of significant and unresolved factual issues.
Against this background, we will endeavor to assist the Eleventh Circuit to the extent practicable, focusing our attention primarily on the issue of when the statute of limitations in a "smoking products-liability case" begins to run. The Eleventh Circuit recited the following facts:
"Because the case is before us on a Rule 12(b)(6)[, Fed. R Civ. P.,] dismissal, we take the facts from the allegations in *105 the complaint, assuming those allegations to be true. See Brown v. Crawford County, Georgia, 960 F.2d 1002, 1010 (11th Cir.1992).
"Carolyn Spain started smoking cigarettes in 1962, when she was `approximately 15 years of age and was a multi-pack per day smoker.' She became addicted to the nicotine in cigarettes early on and was unaware at the time that she was becoming addicted. She primarily smoked cigarettes manufactured by Philip Morris, Inc., R.J. Reynolds Tobacco Company, and Brown & Williamson Tobacco Corporation. Carolyn's smoking was the proximate cause of her lung cancer, which was diagnosed on August 15, 1998. Unable to stop, she, continued smoking until 1999. She has since died.1
1The complaint does not indicate whether Carolyn Spain continued to smoke until she died or the date of her death. About the date of her death, we know only that she died sometime between the diagnosis of lung cancer on August 15, 1998 and the filing of the complaint in this case on August 5, 1999."
230 F.3d at 1303.
The foregoing bare-bones facts are before us. Carolyn became a heavy smoker after beginning to smoke in 1962 when she was approximately 15 years old. We know that she became addicted to the nicotine in cigarettes. We know that she was unaware of her addiction at the outset. She alleges in her complaint that she was unable to stop smoking. She was diagnosed with lung cancer on August 15, 1998, and died within one year.
Facts not before us are legion. Spain points out that the federal district court dismissed his complaint before any discovery began. Presumably, as common sense suggests, Carolyn at some point became aware that she was addicted to cigarettes, but we do not know that for sure. We do not know whether Carolyn experienced any physical consequences of smoking before she was diagnosed with lung cancer in 1998. Reference was made at oral argument before this Court to Carolyn's experiencing shortness of breath, but nothing in the record thus far suggests that fact. Perhaps members of the Court could draw upon personal experience and surmise that Carolyn, as a multi-pack per day addicted smoker, experienced shortness of breath, periodic episodes of coughing, throat irritation, and reduction in gustatory and olfactory capacities, but we cannot so conclude with certainty. We do not know whether symptoms of cancer or cancer cells were present at any time before the diagnosis in August 1998. We know from matters generally regarded as public knowledge that the surgeon general of the United States has mandated the inclusion of warnings on packages of cigarettes since sometime in the 1960s. We further know that the text of the warning has been adjusted over the years. However, the parties have not furnished us with information regarding the various formulations in the text and the dates of the changes.

I. The Claims Alleged in the Complaint

Before responding to the question dealing with when the statutory limitations period begins to run, we must first assess the viability of causes of action alleged in the complaint sounding in tort and in breach of warranty.

A. Tort Claims

With respect to tort claims, the complaint alleges negligence, wantonness, and claims under the AEMLD. In a secondary question, the Eleventh Circuit asks us to validate its assumption that the AEMLD subsumes preexisting remedies *106 at common law. We noted in Keck v. Dryvit Systems, Inc., 830 So.2d 1 (Ala. 2002), that the AEMLD, announced in Casrell v. Altec Industries, Inc., 335 So.2d 128 (Ala.1976), is "a judicially created accommodation of Alabama law to the doctrine of strict liability for damage or injuries caused by allegedly defective products." 830 So.2d at 5. We cannot deduce from this Court's announcement of the AEMLD in Casrell that the common law was thereby abrogated by negative inference. As we said in Keck, "Judicial decision-making should not be seen as the opportunity to legislate and, to the extent Casrell stands as an example of judicial legislation, it is time for this Court to defer to the Legislature for further expansion of the sweep of its holding." 830 So.2d at 8. Spain's negligence and wantonness claims are, at this stage of the proceedings, viable alternatives to his AEMLD claim.

B. Implied-Warranty Claims

Spain abandoned his express-warranty claims during oral argument at the Eleventh Circuit. As to the implied-warranty claim, the Eleventh Circuit stated: "Unless the Alabama Supreme Court tells us differently, we are convinced that the complaint does not state a claim for breach of an implied warranty of merchantability." Spain, 230 F.3d at 1310-11. In light of Shell v. Union Oil Co., 489 So.2d 569 (Ala.1986), and Yarbrough v. Sears, Roebuck & Co., 628 So.2d 478 (Ala.1993), in which this Court declined to permit claims arising out of the use of allegedly unreasonably dangerous products to be redressed under the Uniform Commercial Code ("the UCC"), instead remitting the parties to remedies under the AEMLD, we cannot so limit the scope of the remedy for breach of an implied warranty.
In Shell v. Union Oil Co., Shell alleged "breach of warranty of merchantability" because a naphtha product, purchased by his employer and then provided to him, contained benzene, a cancer-causing agent. He alleged that the benzene was not "`fit for the ordinary purposes for which such goods are used.'" 489 So.2d at 571 (quoting § 7-2-314(2)(c), Ala.Code 1975). He further alleged that, because benzene was a cancer-causing substance, benzene was unreasonably dangerous and was not merchantable.
The defendants, the suppliers of the naphtha product, moved for a summary judgment. The evidence showed that the naphtha product "was purchased by [Shell's employer] on a bid basis, in compliance with its specifications, which limited the amount of benzene any shipment could contain." Shell, 489 So.2d at 570. "Upon delivery [of the naphtha product, the employer] tested a random sampling of the shipments to assure that they conformed to its specifications." Id. The trial court entered a summary judgment in favor of the defendants.
On appeal, Shell raised three issues:
"(1) Was there a duty owed, i.e., was there an implied promise?
"(2) If so, was that duty breached, i.e., was the promise unperformed? and
"(3) Did that duty extend to [Shell], i.e., was the obligation of performance intended for Shell's protection ...?"
489 So.2d at 570. Shell argued that the defendants had breached the implied warranty of merchantability "because the [naphtha product] supplied by Defendants caused cancer, it could not be `fit for the ordinary purposes for which such goods are used'; that is, because this is a cancer-causing substance, it is unreasonably dangerous, *107 and, therefore, cannot be merchantable." 489 So.2d at 571.
As to that argument, this Court stated:
"Such an argument ignores the clear distinction between causes of action arising under tort law and those under the U.C.C. as adopted in Alabama. A Texas court recognized that distinction in Mid Continent Aircraft Corp. v. Curry County Spraying Service, Inc., 553 S.W.2d 935 (Tex.Civ.App.1977):
"`[U.C.C.] law, whose statutory language makes no reference to tort law in connection with products liability, concerns itself with the quality of the product by establishing standards of merchantability for a particular purpose... [while the tort law] concerns itself with safety standards by imposing strict liability upon one who sells an unreasonably dangerous product which causes physical harm. The considerations supporting either of the principles are not affected by the considerations underlying the other, and the standards of quality of a product, with the attendant risk of the bargain, are entirely distinct from its standards of safety, with a possible unreasonable risk of harm. It follows that a violation of the standards of safety which results in physical harm to the unreasonably dangerous product itself subjects the seller to the tort rule of strict liability.' 553 S.W.2d at 940.
"See, generally, Casrell v. Altec Industries, Inc., 335 So.2d 128 (Ala.1976); and Atkins v. American Motors Corp., 335 So.2d 134 (Ala.1976).
"Whether this product was unreasonably dangerous, therefore, is not a question properly addressed in an action brought under the provisions of the U.C.C. That question could properly be raised in an action brought under Alabama's Extended Manufacturer's Liability Doctrine (A.E.M.L.D.), but not in this U.C.C. action for breach of warranty.
"To cover the initial bare bones question (Was there a duty owed?) with flesh, we should reask the question: Did the sale of the subject product give rise to an implied warranty of merchantability in the sense that these two manufacturers promised the employee that he would not be injured by his use of or contact with their product? The answer must be made in the context of § 7-2-314: `[Whether this product was] fit for the ordinary purposes for which such goods are used.' In this instance, the productmade to [the employer's] specificationsperformed the job it was intended to do; and the manufacturers' warnings and precautions, accompanying the products, were in keeping with their knowledge of its inherent dangers. Thus, any duty arising under this section of the Code was not breached. Indeed, more precisely, these undisputed facts do not give rise to a warranty of merchantability, as contended by Shell.
"The implied warranty mandated by this section of the U.C.C. is one of commercial fitness and suitability, and a private right of action is afforded only where the user or consumer is injured by the breach of that warranty. That is to say, the U.C.C. does not impose upon the seller the broader obligation to warrant against health hazards inherent in the use of the product when the warranty of commercial fitness has been complied with. Those injured by the use of or contact with such a product, under these circumstances, must find their remedy outside the warranty remedies afforded by the U.C.C. For an excellent discussion of this subject, see J. White & R. Summers, Handbook of the Law Under *108 the Uniform Commercial Code, § 9-7, pp. 350-353 (2d ed.1980)."
Shell, 489 So.2d at 571-72 (emphasis in final paragraph original; other emphasis added). Thus, Shell turns on the fact that the naphtha product was "fit for the ordinary purposes for which such goods are used." 489 So.2d at 571. Shell does not stand for the proposition that a product "unfit for the ordinary purposes for which such goods are used" cannot be unmerchantable.
In Yarbrough v. Sears, Roebuck & Co., supra, the Yarbroughs had purchased a kerosene heater from Sears. A decal on the heater warned against using gasoline in the kerosene heater. The manufacturer included instructions and warnings with the heater, including several warnings against using gasoline in the kerosene heater.
About one year after purchasing the heater, Mr. Yarbrough purchased fuel "from a gasoline-type fuel pump labeled `kerosene'" and filled the heater with the fuel. 628 So.2d at 480. Some time after the Yarbroughs lit the heater, which was in the kitchen, they "heard a `poof' noise from the kitchen." Id. The heater had caught fire. The fire destroyed the Yarbroughs' home and their personal belongings. The experts for the plaintiffs and for the defendants agreed that the fire resulted from using gasoline rather than kerosene as the fuel in the kerosene heater.
The Yarbroughs sued Sears and the manufacturer of the kerosene heater, alleging a violation of the AEMLD and breach of implied and express warranties. This Court summarized the Yarbroughs' claim as being to the effect that the defendants breached the implied warranty of merchantability because "the kerosene heater was unreasonably dangerous and therefore could not be merchantable." Yarbrough, 628 So.2d at 483.
The defendants moved for a summary judgment. The Yarbroughs did not present any evidence indicating that the heater was "[un]fit for the ordinary purposes for which such goods are used." Shell, 489 So.2d at 571. In fact, the Yarbroughs' own expert admitted that the destruction of the Yarbroughs' house and personal belongings "was the result of using gasoline, as opposed to kerosene, in the kerosene heater." Yarbrough, 628 So.2d at 480. The trial court entered a summary judgment in favor of the defendants. The Yarbroughs appealed. On the issue of breach of the implied warranty of merchantability, this Court held:
"`Such an argument ignores the clear distinction between causes of action arising under tort law and those arising under the U.C.C. as adopted in Alabama.' Shell v. Union Oil Co., 489 So.2d 569, 571 (Ala.1986). Whether the kerosene heater was unreasonably dangerous is not a question properly addressed in a claim alleging breach of warranty under the U.C.C., but it could be, and was, properly raised in a claim under the AEMLD."
Yarbrough, 628 So.2d at 483.
In each case alleging a breach of the implied warranty of merchantability, the determination whether there was a breach requires a fact-intensive analysis. In paragraph 21 of his complaint, Spain alleged that the cigarettes designed, manufactured, and sold by the manufacturers "were not fit for the ordinary purposes for which they are used." Thus, he alleged a breach of the implied warranty of merchantability. Because this case is before the Eleventh Circuit on a motion to dismiss, the record before us does not contain any evidence indicating that the cigarettes smoked by Carolyn were "fit for the ordinary purposes for which they are used." *109 Therefore, this case is factually distinguishable from Shell and Yarbrough.
Allen v. Delchamps, Inc., 624 So.2d 1065 (Ala.1993), was decided seven days after the decision in Yarbrough was released. In Allen, Beverly Allen bought two bags of celery hearts from a Delchamps grocery store, which had inspected sample bags of celery at its warehouse for freshness and quality. After Allen washed and ate a piece of raw celery, she had an anaphylactic-shock reaction. Three days later, her husband took the two bags of celery to a laboratory for testing. The laboratory found that the unopened bag of celery contained 1.2 parts per million of sodium bisulfite and that the opened bag contained.5 parts per million of sodium bisulfite. One of Allen's treating doctors determined that Allen, an asthmatic, was sensitive to metabisulfites. "There was evidence presented that 1.2 percent of the world population are asthmatics, that approximately 8 percent of asthmatics are sensitive to sulfites, and that approximately .096 percent of the world population are asthmatics who are sensitive to sulfites." Allen, 624 So.2d at 1066.
The Allens sued Delchamps, alleging negligence, wantonness, violations of the AEMLD, and breach of the implied warranty of merchantability under § 7-2-314, Ala.Code 1975. Delchamps moved for a summary judgment on all claims. The trial court granted the motion and "certified the summary judgment as final pursuant to Rule 54(b), Ala. R. Civ. P." 624 So.2d at 1067. The Allens appealed.
We held, in pertinent part:
"In regard to their AEMLD claim, the plaintiffs must prove that Mrs. Allen `suffered injury or damages to [herself] or [her] property by one who sold a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer.' Atkins v. American Motors Corp., 335 So.2d 134, 141 (Ala.1976). Similarly, the plaintiffs' implied warranty of merchantability claim requires that the plaintiffs show that the goods were unmerchantable or unfit for the ordinary purposes for which they are used. Ala.Code 1975, § 7-2-314. These two standards `go hand-in-hand,' at least as applied to food products, `for it is apparent that a food product is defective or unreasonably dangerous if it is unmerchantable or unfit for human consumption.' Cain v. Sheraton Perimeter Park S. Hotel, 592 So.2d 218, 220 (Ala.1991) (quoting Ex parte Morrison's Cafeteria of Montgomery, Inc., 431 So.2d 975, 977 (Ala.1983))."
Allen, 624 So.2d at 1068 (emphasis added). This Court held that "[w]hether sulfite preservatives on fresh produce are within the reasonable expectations of a consumer is a question for a jury." Id.
In Ex parte General Motors Corp., 769 So.2d 903 (Ala.1999), the plaintiff Aaron Tucker bought a new Chevrolet Camaro automobile from the dealer. Shortly after he bought the automobile, it began stalling while Tucker was driving. He testified by deposition that it stalled about three times per week. Tucker returned the automobile to the dealer several times, but the stalling problem persisted. Thereafter, while Tucker was driving the automobile, the automobile stalled, and Tucker lost the power steering and the power brakes. The automobile left the roadway and collided with a utility pole. Tucker was injured. The automobile was repaired, but the stalling problem continued. On another occasion, about one year later, the automobile stalled and would not restart. Because it was the Fourth of July weekend, Tucker could not have the automobile towed until the next day. Tucker left the automobile by the side of the road overnight, *110 and it was vandalized. The dealer refused to repair the automobile.
Tucker sued, alleging breach of express warranties and breach of the implied warranties of merchantability and fitness for a particular purpose. The defendants, the automobile manufacturer and the automobile dealer, moved for a summary judgment. The trial court entered a summary judgment in favor of the defendants. Tucker appealed. The Court of Civil Appeals affirmed in part, reversed in part, and remanded. The Court of Civil Appeals affirmed the summary judgment on the breach of the implied warranties of merchantability and of fitness for a particular purpose. We granted Tucker's petition for a writ of certiorari.
On the breach of the implied warranty of merchantability, this Court held:
"As the Court of Civil Appeals held, `[t]o establish his claim of breach of the implied warranty of merchantability, Tucker must "`prove the existence of the implied warranty, a breach of that warranty, and damages proximately resulting from that breach.'"' [Tucker v. General Motors Corp.,] 769 So.2d [895,] 901 [ (Ala.Civ.App.1998) ] (quoting Barrington Corp. v. Patrick Lumber Co., 447 So.2d 785, 787 (Ala.Civ.App.1984), quoting, in turn, Storey v. Day Heating and Air Conditioning Co., 56 Ala.App. 81, 83, 319 So.2d 279, 280 (1975)). Because this case is before this Court on appeal from a summary judgment in favor of GM and Bishop, we are concerned only with whether Tucker presented substantial evidence of each of these three factors so as to create a jury question.
"As we have mentioned above, the only evidence in the record is Tucker's deposition and his affidavit. They contain uncontroverted evidence that Tucker purchased the car in question from Bishop [the automobile dealer]. It appears undisputed that Bishop is a `seller' of automobiles, as that term is defined in § 7-2-103, Ala.Code 1975. Thus, § 7-2-314's requirement that the seller be a `merchant with respect to goods of that kind' is met, and the record shows that Tucker has presented substantial evidence of the existence of the implied warranty. The record also contains evidence tending to establish a breach of the implied warranty of merchantability, because there was undisputed evidence tending to show that the car stalled repeatedly while Tucker was driving it and that Bishop failed to correct the problem when he took the car to Bishop for repair.
"Bishop does not dispute that evidence indicating that the car had a stalling problem was presented; it contends that this evidence is insufficient to create a genuine issue of material fact on the question whether it breached an implied warranty of merchantability. Bishop argues that to create a genuine issue of material fact, Tucker was required to present expert testimony as to why the car stalled.
"Bishop relies on Brooks v. Colonial Chevrolet-Buick, Inc., 579 So.2d 1328 (Ala.1991), and Sears, Roebuck & Co., Inc. v. Haven Hills Farm, Inc., 395 So.2d 991 (Ala.1981), as support for its argument that expert testimony was necessary in this case. Bishop argues that Tucker was required to present expert testimony identifying the specific cause of his car's stalling problem in order to avoid the entry of a summary judgment. [Bishop] argues:
"`In [Haven Hills Farm], a fittingly [analogous] case, a buyer brought a products liability claim for a defective car tire. The Supreme Court in [Haven Hills Farm] equated the legal *111 burden in a products liability case to that of the Plaintiff's burden in a breach of warranty case. [395 So.2d] at 995. In both types of cases, the Plaintiff must prove a defect, "which rendered the product not fit for its anticipated useand the defect links to the defendant."'
"Bishop's Brief at 11. Bishop also cites Brooks as support for its argument.
"Bishop's reliance on Brooks and Haven Hills Farm is, however, misplaced. Those cases involved claims brought under the Alabama Extended Manufacturer's Liability Doctrine (`AEMLD'). The AEMLD doctrine is based in tort law, having evolved from negligence law and having been influenced by Restatement (Second) of Torts. Haven Hills Farm, 395 So.2d at 993-94. Under the AEMLD, a plaintiff is required to prove, among other things, that a product is unreasonably dangerous as a result of a defect and that the plaintiff suffered injury as a result of the defect. Id. at 994.
"We are aware, of course, that in defining `defect,' this Court incorporated into AEMLD law some of the analysis applicable in cases arising, as does this one, under the UCC doctrine of the implied warranty of merchantability. Id. Specifically, this Court has combined the doctrine of `fitness for the ordinary purpose intended' of UCC law and the tort concept of `unreasonably dangerous' in defining `defect.' See Haven Hills Farm, supra, for further discussion of AEMLD law.
"We do not believe the fact that this Court borrowed some principles from UCC law in developing a definition of `defect,' as that term is used in AEMLD cases, forces the conclusion that principles of AEMLD law are always applicable in cases involving the implied warranty of merchantability. In fact, this Court has continued to recognize the clear distinction between AEMLD law and UCC law. See Yarbrough v. Sears, Roebuck & Co., 628 So.2d 478 (Ala.1993), and Shell v. Union Oil Co., 489 So.2d 569 (Ala.1986).
"Finally, we note that this Court has previously affirmed judgments entered against defendants in breach-of-warranty cases where the plaintiffs did not present the kind of expert testimony Bishop argues is required here. See Volkswagen of America, Inc. v. Dillard, 579 So.2d 1301 (Ala.1991), and Ford Motor Co., Inc. v. Phillips, 551 So.2d 992 (Ala.1989).
"Alabama law does not require that an expert witness testify in every case involving an alleged malfunction of a product where the plaintiff has sued alleging a breach of the implied warranty of merchantability. Given the uncontradicted evidence in this case, we conclude that Tucker presented substantial evidence of a breach of the implied warranty of merchantability and of damage and thereby created a genuine issue of material fact."

Ex parte General Motors Corp., 769 So.2d at 912-13 (emphasis on "expert testimony" in second full paragraph of quoted material original; other emphasis added). Thus, a claim alleging breach of an implied warranty of merchantability is separate and distinct from an AEMLD claim and is viable to redress an injury caused by an unreasonably dangerous product.

II. The Statute of Limitations

The first certified question deals with the pivotal threshold issue of when the statutory limitations period begins to run on tort as well as warranty claims in a "smoking products-liability case."

*112 A. Tort Claims

The Eleventh Circuit notes that Spain contends that Carolyn did not have an actual injury, and thus the cause of action did not accrue, until August 15, 1998, when Carolyn was diagnosed with lung cancer. Accordingly, Spain argues that the complaint, which was filed on August 5, 1999, was filed before the statutory limitations period expired. Alabama's Wrongful Death Act, § 6-5-410, Ala.Code 1975, requires that an action be filed within two years of the date of the death. Furthermore, for the death to be actionable, the decedent must have been able to bring an action without the bar of limitations as a defense had he or she lived. Hall v. Chi, 782 So.2d 218, 221 (Ala.2000). This action was filed within two years of Carolyn's death.
The relevant inquiry turns upon whether Carolyn could have filed an action at the time of her death against the manufacturers alleging negligence or claims under the AEMLD that would not have been barred by the two-year statute of limitations applicable to all of the tort claims set forth in the complaint. See § 6-2-38, Ala.Code 1975.
The Eleventh Circuit observes: "The defendants argue that, taking the complaint as true, a `completed wrong' occurred, and thus Spain's cause of action arose, when Carolyn became addicted to cigarettes shortly after she began smoking in 1962." 230 F.3d at 1306. Before us, the manufacturers' position as to addiction is not as neatly presented. An answer to the first question in the context of addiction as a starting point of the running of our two-year statutory limitations period requires an analysis of whether that issue is available to this Court based upon the briefs submitted to us.
While an amicus brief filed in this case by the plaintiff in the Tillman[4] case rejects addiction as a compensable physical injury, Spain makes no such concession. To the contrary, Spain states in his brief to this Court that "[t]he issue of whether Mrs. Spain's addiction, standing alone, was a legal injury, or that her addiction proximately caused or contributed to her death, depends on medical opinions and/or historical facts which should not be addressed in the context of a Rule 12(b)(6) motion to dismiss."
The manufacturers contend that addiction to cigarettes is not a compensable tort; they cite five cases in support of that contention. The manufacturers first cite Castano v. American Tobacco Co., 84 F.3d 734 (5th Cir.1996), for its reference to the novelty of the theory. However, the court in Castano was reviewing, and reversed, a trial court's class-certification order. In so doing, the United States Court of Appeals for the Fifth Circuit observed that the addiction-as-injury claims were "permeated with individual issues, such as proximate causation, comparative negligence, reliance, and compensatory damages." 84 F.3d at 750. That court noted: "State courts are more than capable of providing definitive statements regarding the validity of addiction-as-injury claims." 84 F.3d at 750 n. 29. Castano simply does not stand for the proposition for which the manufacturers cite it. The manufacturers next cite an unpublished opinion of an Illinois trial court, noting that that court found no authority on which to base a holding that addiction was a compensable injury. Clearly, this opinion is not binding, and its persuasive value is questionable. The manufacturers next cite an unpublished opinion of the United States District Court for the Southern District of *113 Alabama, which holds that an inmate's addiction claim did not satisfy the physical-injury requirement of 42 U.S.C. § 1997e(e). The federal district court's decision was reversed in Mitchell v. Brown & Williamson Tobacco Corp., 294 F.3d 1309 (11th Cir.2002), on the ground that 42 U.S.C. § 1997e(e) did not apply. The Eleventh Circuit stated that it would not reach the question whether the inmate's complaint stated a claim under state law because the district court had not yet addressed the issue. The manufacturers next cite Emig v. American Tobacco Co., 184 F.R.D. 379 (D.Kan.1998), a case declining to certify a class action. Finally, the manufacturers cite an unpublished opinion in Lyons v. American Tobacco Co. (No. Civ. A 96-0881-BH-S, September 30, 1997) (S.D.Ala.1997) (not published in F.Supp.), stating that it applies Castano. This statement is accurate. But Lyons is another class-action case applying Castano on unrelated issues concerning class certification.
The manufacturers' resistance to the viability of addiction as a claim for relief does not justify the conclusion that they have therefore waived any defense of limitations should the claim be deemed viable. In their brief to this Court, the manufacturers argue: "If, on the other hand, this Court were to find that addiction to cigarettes is a sufficient injury to create a cause of action, then application of the `first-injury' rule would require that Spain's entire complaint be dismissed on statute of limitations grounds." Even assuming that Spain may disavow any damages from addiction, such a litigation posture should not control our analysis of the date of the first injury in determining when the applicable limitations period begins to run. Regardless of the posturing by the parties, addiction to nicotine is a critical consideration in an analysis of the difficult issue of applying the statute of limitations to claims by smokers in smoking products-liability cases.
The United States Court of Appeals for the Ninth Circuit found addiction to nicotine to be the event starting the running of the limitations period in Soliman v. Philip Morris Inc., 311 F.3d 966 (9th Cir.2002), where the Court applied California law to a claim for damages based on nicotine addiction and found the action barred by the statute of limitations. The Ninth Circuit quoted California authority as follows:
"`[W]here an injury, although slight, is sustained in consequence of the wrongful act of another, and the law affords a remedy therefor, the statute of limitations attaches at once. It is not material that all the damages resulting from the act shall have been sustained at that time, and the running of the statute is not postponed by the fact that the actual or substantial damages do not occur until a later date.'"

311 F.3d at 972 (quoting Nodine v. Shiley Inc., 240 F.3d 1149, 1153 (9th Cir.2001), quoting in turn Spellis v. Lawn, 200 Cal. App.3d 1075, 1080-81, 246 Cal.Rptr. 385 (1988)) (emphasis added). That holding is comparable to the holding in Garrett v. Raytheon Co., 368 So.2d 516 (Ala.1979), superseded by statute on other grounds, as noted in Johnson v. Garlock, Inc., 682 So.2d 25 (Ala.1996). In Soliman, the Ninth Circuit held that a smoker's action against cigarette manufacturers alleging that he suffered from nicotine addiction and other injuries accrued, for limitations purposes, on the date that the smoker knew or should have known that he was addicted, and that even if the cigarette manufacturers attempted to conceal the risks of addiction, the smoker was charged with common knowledge that smoking causes addiction. The Court held: "Soliman alleges that he suffered a number of significant injuries from the cigarettes he *114 smoked. The injury he should have known about first [i.e., addiction] is the one that starts the statute of limitations." 311 F.3d at 972 (footnote omitted). The date Carolyn became addicted to nicotine is the date the statutory limitations period began to run as to Spain's tort claims.
Paragraph 25 of Spain's complaint states: "The [manufacturers'] cigarette products, when used as intended[,] were highly likely to induce in foreseeable users a state of habituation, habit formation and/or dependence, characterized by users' great difficulty in terminating or restricting their chronic use." Such an allegation is not atypical, given that addiction to nicotine has been recognized as an essential part of a smoker's claims. See, e.g., Barnes v. American Tobacco Co., 161 F.3d 127, 144 (3d Cir.1998) ("Addiction remains an essential part of plaintiffs' claim. In order to prevail on their medical monitoring claimunder any of their three theories of liability (negligence, strict products liability, and intentional exposure to a hazardous substance)plaintiffs must demonstrate that defendants caused their exposure to tobacco.").
Addiction to nicotine is a compensable injury, at a minimum, in terms of the costs of supporting an addiction. Assuming no other physical injury has previously manifested itself, the economic loss attributable to supporting an addiction is the first injury a smoker addicted to cigarettes sustains, regardless of whether a plaintiff frames the complaint to seek damages for that economic loss. That other damages might follow, including, but not limited to, injury to the person, such as shortness of breath, loss of the sense of taste and/or smell, coughing, and throat irritation, as well as medical expenses, should not defeat the commencement of the running of the applicable statutory limitations period. See Garrett v. Raytheon Co., 368 So.2d at 519 ("The cause of action `accrues' as soon as the party in whose favor it arises is entitled to maintain an action thereon. `We have held that the statute begins to run whether or not the full amount of damages is apparent at the time of the first legal injury.'" (Quoting Home Ins. Co. v. Stuart-McCorkle, Inc., 291 Ala. 601, 608, 285 So.2d 468, 473 (1973) (emphasis added))). Artful pleading such as is presented here, where Spain disavows seeking a recovery for all pre-cancer injuries, should not defeat the operation of the first-injury rule.
Where multiple acts are involved, subsequent damages have been recognized as flowing from subsequent acts, and the fact that a limitations period may have expired as to an earlier act does not bar an action for the subsequent injury. See Employers Ins. Co. of Alabama v. Rives, 264 Ala. 310, 87 So.2d 653 (1955) (repetitive acts); Howell v. City of Dothan, 234 Ala. 158, 174 So. 624 (1937) (ongoing discharge of sewage); Alabama Fuel & Iron Co. v. Vaughn, 203 Ala. 461, 83 So. 323 (1919) (damage resulting from the ongoing operations of a coal mine). However, the ongoing acts of the manufacturers are the repeated sales to a consumer who at some point might recognize that an addiction makes the consumer/smoker a participant in the additional acts and an enabler of their continued occurrence. Under these circumstances, while a new period of limitations for subsequent sales to an admitted addict of additional packs of cigarettes containing warnings may produce additional injuries giving rise to new causes of action with new limitations periods, significant problems of proof of causation stand between a smoker and recovery. See Nicolo v. Philip Morris, Inc., 201 F.3d 29, 39 (1st Cir.2000), in which the United States Court of Appeals for the First Circuit rejected a continuing-tort argument, noting: *115 "Leaving aside the absence of precedent in Rhode Island, the dispositive answer is that, given plaintiff's knowledge that she had been `hooked' since at least the early 1980s, any subsequent dissimulation or misrepresentation by defendants as to their intent and knowledge bore no causal relation to plaintiffs' [sic] condition."
Spain contends that whether Carolyn's addiction proximately caused or contributed to her death depends on medical opinions and/or historical facts, thus precluding a dismissal on the manufacturers' motion made pursuant to Rule 12, Fed.R.Civ.P. First, this contention impermissibly restricts the analysis of the first injury to events causing Carolyn's death. As previously noted, the relevant inquiry is whether Carolyn could maintain an action against the manufacturers at the time of her death. Second, whether the contention contradicts Spain's complaint, as the manufacturers contend, is not a matter before us. Assuming that argument is available to Spain, the procedure for applying the facts to the applicable law involves the Federal Rules of Civil Procedurenot Alabama law. It is not the province of this Court to supply answers to questions governed by federal law in response to a certified question. See Spain v. Brown & Williamson Tobacco Corp., 230 F.3d at 1312 n. 16.
We therefore answer the first question as to the tort claims by stating that the statutory limitations period begins to run at the moment a smoker recognizes that he or she has become addicted.

B. Implied-Warranty Claims

The applicable statute of limitations for a claim for breach of implied warranty is set forth in § 7-2-725, Ala.Code 1975, which provides that "[a]n action for breach of any contract for sale must be commenced within four years after the cause of action has accrued," § 7-2-725(1), and that "a cause of action for damages for injury to the person in the case of consumer goods shall accrue when the injury occurs," § 7-2-725(2). Spain must avoid the manufacturers' defense to the wrongful-death action that Carolyn could not have maintained a claim had she lived. See § 6-5-410, Ala.Code 1975, and Hall v. Chi, supra. Under § 7-2-725, any injury occurring from the breach of an implied warranty within the four-year period before Carolyn's death on August 5, 1999, would be actionable. But, if the evidence reflects continued consumption with knowledge of the risk of cancer in the late 1990s and if the explicit warnings on each package of cigarettes are deemed sufficient, significant problems of proof of a causal connection are presented. See Official Comment to § 7-2-314, at paragraph 13 ("Action by the buyer following an examination of the goods which ought to have indicated the defect complained of can be shown as matter bearing on whether the breach [of the implied warranty of merchantability] itself was the cause of the injury.") (emphasis added). See also Official Comment to § 7-2-316, at paragraph 8 ("Of course if the buyer discovers the defect and uses the goods anyway, or if he unreasonably fails to examine the goods before he uses them, resulting injuries may be found to result from his own action rather than proximately from a breach of warranty.") (emphasis added). See also Official Comment to § 7-2-715, at paragraph 5 ("Where the injury involved follows the use of goods without discovery of the defect causing the damage, the question of `proximate' cause turns on whether it was reasonable for the buyer to use the goods without such inspection as would have revealed the defects. If it was not reasonable for him to do so, or if he did in fact discover the defect prior to his use, the *116 injury would not proximately result from the breach of warranty.") (emphasis added). See also Green v. American Tobacco Co., 154 So.2d 169, 172 (Fla.1963) ("If the defect is discoverable by simple observation then the law will imply no warranty against its existence.").

III. Remaining Questions

We respectfully decline to answer the remaining questions. After the federal litigation has produced a final determination of the merits of the manufacturers' defense of limitations and causation under the principles set forth in this opinion, whether on motion practice pursuant to either Rule 12, Fed.R.Civ.P., or Rule 56, Fed.R.Civ.P.; on a judgment as a matter of law; or on a judgment after a trial on the merits, as the Eleventh Circuit might deem appropriate, any remaining questions can again be submitted to this Court pursuant to Rule 18, Ala. R.App. P.
CERTIFIED QUESTION 1 AND CERTIFIED QUESTIONS a. AND b. ANSWERED; OTHER QUESTIONS DECLINED.
PART I.A.: MOORE, C.J., and HOUSTON, LYONS, BROWN, HARWOOD, and WOODALL, JJ., concur.
JOHNSTONE, J., concurs specially.
STUART, J., expresses no opinion.
PART I.B.: MOORE, C.J., and LYONS and HARWOOD, JJ., concur.
JOHNSTONE and WOODALL, JJ., concur specially.
HOUSTON and BROWN, JJ., concur in the result.
STUART, J., expresses no opinion.
PART II.A.: HOUSTON and LYONS, JJ., and MADDOX, Special Justice,[*] concur.
STUART, J., concurs in part.
BROWN, J., concurs in the result.
JOHNSTONE, J., concurs in part and dissents in part.
MOORE, C.J., and HARWOOD and WOODALL, JJ., dissent.
PART II.B.: MOORE, C.J., and HOUSTON, LYONS, and HARWOOD, JJ., concur.
WOODALL, J., concurs in the result.
JOHNSTONE, J., concurs in part and dissents in part.
BROWN and STUART, JJ., express no opinion.
PART III.: MOORE, C.J., and LYONS, BROWN, HARWOOD, and WOODALL, JJ., concur.
HOUSTON, J., concurs in part and dissents in part.
JOHNSTONE, J., dissents.
STUART, J., expresses no opinion.
MOORE, Chief Justice (concurring in Parts I.A., I.B., II.B., and III, and dissenting from Part II.A.).
I concur with the per curiam opinion as to Parts I.A., I.B., II.B., and III.
I dissent from Part II.A. of the per curiam opinion because I do not believe that "[a]ddiction to nicotine is a compensable injury," 872 So.2d at 114, or that, if it is a compensable injury, "the statutory limitations period begins to run at the moment a smoker recognizes that he or she has *117 become addicted." 872 So.2d at 115. Justice Johnstone in his special writing adequately addresses the foreseeable problems that arise from the designation of nicotine addiction as a compensable injury and in determining the point at which a cause of action for such an injury accrues. The amorphous and manipulable "standard" created by the per curiam opinion's holdingthat the limitations period begins to run when a smoker "recognizes" that he or she is addictedwill likely wreak much legal havoc and provide no real standard at all. Furthermore, the recognition of addiction to cigarettes as a compensable injury will likely spark frivolous claims of compensable addiction as to numerous other products.
HOUSTON, Justice (concurring in Parts I.A., II.A., and II.B., concurring in the result in Part I.B., and concurring in part and dissenting in part as to Part III).
I concur as to Parts I.A., "Tort Claims," and II, "The Statute of Limitations," in the per curiam opinion.
I concur in the result as to I.B., "Implied-Warranty Claims."
As to Part III, I concur except as follows. I would answer certified question 2 in the affirmative. See Ex parte Liberty Nat'l Life Ins. Co., 825 So.2d 758, 763-65 (Ala.2002). I would answer certified question 3 as follows:
The 20-year period of the rule of repose begins to run against a plaintiff's claims the first time those claims could have been asserted, regardless of the plaintiff's notice of the claims. Ex parte Liberty Nat'l Life Ins. Co., 825 So.2d at 763-65.
BROWN, Justice (concurring in Part I.A. and Part III, concurring in the result in Parts I.B. and II.A., and expressing no opinion as to Part II.B.).
I concur in Part I.A. and Part III of the per curiam opinion. I concur in the result in Part I.B. of the per curiam opinion. I concur only in the result in Part II.A. of the per curiam opinion that holds that the statutory period of limitations began to run when Carolyn Spain became addicted to cigarettes.
JOHNSTONE, Justice (concurring in part, concurring specially in part, and dissenting in part).
I concur in seven of the holdings in the main opinion. I will simply recite them in the order of their appearance:
1. "Spain's negligence and wantonness claims are, at this stage of the proceedings, viable alternatives to his AEMLD claim," 872 So.2d at 106;
2. "[A] claim alleging breach of an implied warranty of merchantability is separate and distinct from an AEMLD claim and is viable to redress an injury caused by an unreasonably dangerous product," 872 So.2d at 111;
3. "Alabama's Wrongful Death Act, § 6-5-410, Ala.Code 1975, requires that an action be filed within two years of the date of the death. Furthermore, for the death to be actionable, the decedent must have been able to bring an action without the bar of limitations as a defense had he or she lived. Hall v. Chi, 782 So.2d 218, 221 (Ala.2000)," 872 So.2d at 112;
4. "Where multiple acts are involved, subsequent damages have been recognized as flowing from subsequent acts, and the fact that a limitations period may have expired as to an earlier act does not bar an action for the subsequent injury," 872 So.2d at 114;
5. "[A] new period of limitations for subsequent sales to an admitted addict of additional packs of cigarettes containing *118 warnings may produce additional injuries giving rise to new causes of action with new limitations periods ...," 872 So.2d at 114;
6. "The applicable statute of limitations for a claim for breach of implied warranty is set forth in § 7-2-725, Ala.Code 1975, which provides that `[a]n action for breach of any contract for sale must be commenced within four years after the cause of action has accrued,' § 7-2-725(1), and that `a cause of action for damages for injury to the person in the case of consumer goods shall accrue when the injury occurs,' § 7-2-725(2)," 872 So.2d at 115; and
7. "Under § 7-2-725, any injury occurring from the breach of an implied warranty within the four-year period before Carolyn's death on August 5, 1999, would be actionable," 872 So.2d at 115, (note that the time limit, "within the four-year period," applies to "injury occurring" rather than to "breach of an implied warranty," as the breach may have occurred earlier without starting the running of the four-year period of limitation).
I concur in the seven foregoing holdings.
I respectfully dissent, however, from a different set of interrelated holdings:
1. "[A]ddiction to nicotine is a critical consideration in an analysis of the difficult issue of applying the statute of limitations to claims by smokers in smoking products-liability cases," 872 So.2d at 113;
2. "The date Carolyn became addicted to nicotine is the date the statutory limitations period began to run as to Spain's tort claims," 872 So.2d at 114;
3. "Addiction to nicotine is a compensable injury, at a minimum, in terms of the costs of supporting an addiction. Assuming no other physical injury has previously manifested itself, the economic loss attributable to supporting an addiction is the first injury a smoker addicted to cigarettes sustains," 872 So.2d at 114; and
4. "[T]he statutory limitations period begins to run at the moment a smoker recognizes that he or she has become addicted," 872 So.2d at 115.
This set of holdings suffers a number of frailties.
First, it is confused. Is the addiction the first injury, or are the "costs of supporting an addiction," ostensibly the costs of cigarettes, the first injury? If the cigarette costs are the first injury, the addiction must be the cause or a cause rather than an injury. Indeed, Barnes v. American Tobacco Co., 161 F.3d 127, 144 (3d Cir.1998), one of the cases the main opinion cites for this set of holdings, holds "that addiction is the linchpin of causation in this case." (Emphasis added.) If the cigarette costs are the first injury, how do they differ from the pre-addiction cigarette costs? The plaintiff's complaint does not allege that the cigarette costs during addiction differed from the cigarette costs before addiction. For aught that appears in the complaint, Carolyn's cigarette costs were constant and the same before addiction and during addiction. How, then, can the cigarette costs be, as a matter of law, the proximate result of the addiction? How could a court, at this stage of the proceedings, conclude as a matter of law that the cigarette costs are damages at all, as distinguished from ordinary non-essential living costs such as for lipstick and soda pop? Spain's not claiming addiction as an injury is legally significant, notwithstanding the statements in the main opinion to the contrary.
Second, if the main opinion means to hold that the addiction itself is the first injury, this holding is unsupported by authority, and is, indeed, contradicted by one of the cases the main opinion cites, as *119 already mentioned. The main opinion relies principally on Soliman v. Philip Morris, Inc., 311 F.3d 966 (9th Cir.2002), and secondarily on Barnes, supra.
The Soliman court expressly declined to hold that addiction is an injury. Instead, the Soliman court held that the plaintiff's specifically claiming "addiction as one of his distinct injuries," 311 F.3d at 972 (emphasis added), estopped him to deny that it was an injury for the purpose of starting the running of the statutory period of limitation as soon as he "had actual or constructive knowledge of his injury." 311 F.3d at 973. The words of the Soliman court are:
"We need not decide the matter [whether addiction is an injury] here, however, because Soliman can't claim that his addiction is an appreciable injury and, at the same time, ask us to ignore it in determining when his claim accrued. If Soliman had actual or constructive knowledge of his addiction before he was diagnosed with respiratory illness, the date of actual or constructive knowledge of addiction would govern."
311 F.3d at 973. Soliman is distinguishable from the case now before us, because Spain does not claim "addiction as one of [Carolyn's] distinct injuries." 311 F.3d at 972. Therefore he is not estopped to deny that addiction was an injury for the purpose of starting the running of any statute of limitations. Because the Soliman court expressly declined to hold that addiction is an injury, Soliman is hardly authority for the proposition that addiction is.
The Barnes case was a class action by cigarette smokers for medical monitoring. The issue was whether the putative class should be certified. The Barnes court did not hold that addiction was an injury. Rather, the Barnes court held "that addiction is the linchpin of causation in this case." 161 F.3d at 144 (emphasis added). Only as the "linchpin of causation" was addiction "an essential part of plaintiffs' medical monitoring claim." 161 F.3d at 144-46. The significance of addiction in the Barnes case was only that it required individualized proof and therefore foreclosed class certification. The Barnes holding that "addiction is the linchpin of causation" hardly supports, and instead contradicts, the holding of today's main opinion that addiction is an injury. 161 F.3d at 144.
Third, even if addiction be a legally cognizable injury, Spain's complaint still encompasses claims based on distinct acts of negligence or wantonness in the defendants' manufacture of cigarettes committed after the onset of the addiction, and still encompasses AEMLD and breach of warranty claims based on sales made after the onset of the addiction; and such preexisting addiction cannot constitute injury proximately caused by such subsequent breaches of duty and therefore cannot begin the running of any limitation period to bar such claims. That is, the effect could not have preceded the cause.
"Defendants manufactured hundreds of different types of cigarettes over the years and have even made changes within each brand...."
Barnes, 161 F.3d at 135 (quoting Barnes v. American Tobacco Co., 176 F.R.D. 479, 489 (E.D.Pa.1997)) (internal quotation marks omitted). Thus the plaintiff before us may, within the ambit of his pleadings, prove that one or more of the defendants, after the onset of Carolyn's addiction, manufactured and marketed cigarettes containing one or more newly concocted combinations of additives that would cause diseases in smokerscombinations with different and worse disease-causing properties than unadulterated tobacco. The plaintiff could prove that such manufacture was negligent, wanton, or both and that such cigarettes were unreasonably dangerous, *120 unmerchantable, or both. The plaintiff's theories of negligence, wantonness, AEMLD, and breach of implied warranty would accommodate these breaches of duty by the defendants. Axiomatically, the first injury caused by these breaches of duty could not be the preexisting addiction. Only some distinct injury accruing at some subsequent time not apparent from the plaintiff's pleadings could constitute the first injury and therefore could start the running of any statutory period of limitations on such claims. Therefore, the set of addiction-as-injury holdings in the main opinion, with all of the frailties of the set, will resolve only a fraction of this case.
Fourth, the holding that "[a]ddiction to nicotine is a compensable injury," 872 So.2d at 114, will cause profound mischief. If addiction is real, it is equally unverifiable. An unaddicted smoker can claim and fake addiction and nobody else can know the truth. Promptly after the main opinion is published, the lawyer advertisements will tell the members of the smoking public they may have claims for addiction. After speedy consultations countless smokers will realize they just recently became addicted, well within the shortest of the statutory periods of limitations, maybe just yesterday. Our recognizing a cause of action for smoking addiction will create a disincentive for willpower and self-control in a society already wracked with blame-shifting. Present law does not support this holding, and Alabama does not need such new law.
My final dissenting observations address dicta rather than holdings in the main opinion. In several places, the main opinion anticipates that Spain may encounter problems of proof of causation. "No-causal-relation," however, is an affirmative defense to be pleaded and proved by these defendants when the time for such pleading and proof comes. Casrell v. Altec Indus., Inc., 335 So.2d 128, 134 (Ala.1976); Atkins v. American Motors Corp., 335 So.2d 134, 143 (Ala.1976); Caudle v. Patridge, 566 So.2d 244, 248 (Ala.1990). The potential availability of this affirmative defense or of any other for pleading and proof in the future, and Spain's potential proof problems in rebutting potential affirmative defenses or even in proving the essential elements of his various claims, are immaterial to the issue of the sufficiency of Spain's complaint itself as it must be judged now on the defendants' Rule 12(b)(6), Fed.R.Civ.P., motions to dismiss. I dissent from this dicta in the main opinion about such proof problems because the dicta may be confused with or mistaken for holding.
I was the first of the Justices on this Court to undertake to answer the questions in this case certified to us by the Eleventh Circuit Court of Appeals. I respectfully submit that my version of the answers, which follows, is correct and comprehensive.
The United States Court of Appeals for the Eleventh Circuit certified the following questions to this Court:
"1. When does the Alabama statute of limitations for claims brought under the AEMLD, and claims premised on negligence, wantonness, breach of warranty, and conspiracy begin to run in a smoking products liability case?
"2. Does the Alabama rule of repose apply in a smoking products liability case?
"3. If so, when does the Alabama rule of repose begin to run in a smoking products liability case?
"4. Before the appearance of federally mandated warning labels on cigarette packages, were cigarettes `unreasonably dangerous' under the AEMLD?

*121 "5. Since the appearance of federally mandated warning labels on cigarette packages, have cigarettes been `unreasonably dangerous' under the AEMLD?"
Spain v. Brown & Williamson Tobacco Corp., 230 F.3d 1300, 1312 (11th Cir.2000). The Eleventh Circuit invited this Court to "tell [them] if the conclusions [the Eleventh Circuit Judges] have reached about the following state law issues are incorrect:
"a. that the negligence and wantonness claims merge into an AEMLD claim;
"b. that the sale of cigarettes does not violate the implied warranty of merchantability under Code of Alabama 1975, § 7-2-314;
"c. that the fraudulent suppression claim, which is a basis for Spain's conspiracy claim, is not viable under Alabama law; and
"d. that, if cigarettes are not unreasonably dangerous as a matter of Alabama law, the fraudulent misrepresentation claim, which is a basis for the conspiracy claim, is not viable under Alabama law."
Id. The Eleventh Circuit recited the following facts:
"This is a cigarette product liability case initially brought in the Alabama state courts by Paul Spain, as administrator of the estate of Carolyn Spain, against Phillip Morris, Inc., R.J. Reynolds Tobacco Company, and Brown & Williamson Tobacco Corporation, seeking recovery under the Alabama wrongful death statute. After removing the case to federal court on diversity grounds, the defendants filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). Stating only that the motion was `well-taken,' the district court granted it and dismissed all of Spain's claims with prejudice. Spain has appealed. For reasons we will explain, we have concluded that certain issues of state law should be certified to the Alabama Supreme Court.

"I. BACKGROUND

"A. FACTS
"Because the case is before us on a Rule 12(b)(6) dismissal, we take the facts from the allegations in the complaint, assuming those allegations to be true. See Brown v. Crawford County, Georgia, 960 F.2d 1002, 1010 (11th Cir.1992).
"Carolyn Spain started smoking cigarettes in 1962, when she was `approximately 15 years of age and was a multi-pack per day smoker.' She became addicted to the nicotine in cigarettes early on and was unaware at the time that she was becoming addicted. She primarily smoked cigarettes manufactured by Phillip Morris, Inc., R.J. Reynolds Tobacco Company, and Brown & Williamson Tobacco Corporation. Carolyn's smoking was the proximate cause of her lung cancer, which was diagnosed on August 15, 1998. Unable to stop, she continued smoking until 1999. She has since died.
"B. PROCEDURAL HISTORY
"On August 5, 1999, Paul Spain, as administrator of the estate of Carolyn Watts Spain, filed suit against the defendants in state court, seeking recovery under the Alabama wrongful death statute based on the defendants' alleged wrongful acts and omissions in connection with the manufacture, design and sale of cigarettes. The complaint asserted five causes of action: (1) liability under the Alabama Extended Manufacturers Liability Doctrine (`AEMLD'); (2) negligence; (3) wantonness; (4) breach of warranty; and (5) conspiracy.

*122 "The defendants removed the case to federal court, and after removal filed a motion to dismiss all of Spain's claims under Federal Rule of Civil Procedure 12(b)(6). They argued, among other things, that the claims were barred by Alabama's rule of repose and the applicable statutes of limitations; that as a matter of Alabama law cigarettes are not unreasonably dangerous; and that some of Spain's claims were preempted by federal law. Stating only that the motion was `well-taken,' the district court granted it and dismissed all of Spain's claims with prejudice. This is Spain's appeal of that dismissal."
Spain, 230 F.3d at 1303-04 (footnotes omitted). The Eleventh Circuit made the following conclusions regarding Spain's state-law claims:
"a. Negligence and Wantonness

"The defendants contend that Spain's negligence and wantonness claims are merged into his AEMLD claim as a matter of Alabama law because those claims are based on the same underlying allegations and theory, which is that cigarettes are unreasonably dangerous. In Veal v. Teleflex, Inc., 586 So.2d 188 (Ala. 1991), the Court held that the trial court did not err when it instructed the jury only on the plaintiff's AEMLD claim and refused to instruct the jury on negligence and wantonness. The court stated that the substance of plaintiff's complaint `was that it placed into the stream of commerce a product that was unreasonably dangerous for its intended use' and that constituted an AEMLD claim. See id. at 190-91; accord Wakeland [v. Brown & Williamson Tobacco Corp.], 996 F.Supp. [1213] at 1217-18 [ (1998) ].
"In light of Veal, and because the only allegation in the complaint's counts for negligence and wantonness that are not in the AEMLD count is that the `[d]efendants negligently designed, manufactured, sold, marketed and/or failed to warn about cigarettes that were unreasonably dangerous ...,' we are convinced that the negligence and wantonness claims in this case merge into the AEMLD claim.

"b. Breach of Warranty

"The defendants contend that Spain's implied warranty of merchantability claim must fail because Spain alleges only that cigarettes are unreasonably dangerous and defectively designed, manufactured and marketed, and not that they were commercially unfit or unsuitable for smoking. The defendants argue that Spain's allegations constitute a products liability claim, instead of a breach of implied warranty of merchantability claim.
"Ala.Code § 7-2-314, which governs the implied warranty of merchantability, provides as follows:
"`Unless excluded or modified (Section 7-2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.'
"Ala.Code § 7-2-314(1). In order to be merchantable, goods must be fit `for the ordinary purposes for which such goods are used.' See Allen [v. Delchamps, Inc.], 624 So.2d [1065, 1068 (Ala.1993) ].
"As we read Spain's complaint, his theory is that the cigarettes were unfit for the ordinary purpose for which they are used because they caused cancer, making them unreasonably dangerous and not merchantable. The Alabama Supreme Court rejected a similar claim and stated that `[s]uch an argument ignores the clear distinction between causes of action arising under tort law *123 and those arising under the [Uniform Commercial Code] as adopted in Alabama.' Shell v. Union Oil Co., 489 So.2d 569, 571 (Ala.1986) (no claim for breach of warranty regarding product containing benzene, a carcinogen known to cause leukemia, when product was in conformance with specifications; such a claim is instead an AEMLD action). Unless the Alabama Supreme Court tells us differently, we are convinced that the complaint does not state a claim for breach of an implied warranty of merchantability.

"c. Conspiracy

"The defendants contend that Spain's conspiracy count cannot stand, because it is based on claims of alleged fraudulent suppression and fraudulent misrepresentation of information about smoking risks that are themselves not viable. They argue that those claims are not viable, because Alabama imposes no duty to disclose facts that are already known and the risks of smoking were common knowledge.
"`[A] conspiracy itself furnishes no cause of action. The gist of the action is not the conspiracy but the underlying wrong that was allegedly committed. If the underlying cause of action is not viable, the conspiracy claim must also fail.' Allied Supply Co., Inc. v. Brown, 585 So.2d 33, 36 (Ala.1991) (internal citations omitted). Therefore, to the extent Spain's conspiracy claim is premised on claims of fraudulent suppression and fraudulent misrepresentation, those claims must be viable for his conspiracy claim to be.
"Under Alabama law, a fraudulent suppression claim requires a plaintiff to show:
"`(1) that the defendant had a duty to disclose an existing material fact; (2) that the defendant suppressed that existing material fact; (3) that the defendant had actual knowledge of the fact; (4) that the defendant's suppression of the fact induced the plaintiff to act or to refrain from acting; and (5) that the plaintiff suffered actual damage as a proximate result of acting or not acting.'
"Ex Parte Household Retail Services, 744 So.2d 871, 879 (Ala.1999). Under Cantley [v. Lorillard Tobacco Co., 681 So.2d 1057, 1061 (Ala.1996) ], there is no state law duty to disclose facts other than through advertising or promotion. See Cantley, 681 So.2d at 1061-62. Consequently, unless the Alabama Supreme Court tells us differently, we are convinced that the fraudulent suppression claim fails and the conspiracy claim should be dismissed to the extent it relies on the fraudulent suppression claim.

"A fraudulent misrepresentation claim requires a plaintiff to show:
"`(a) that the defendant made a false misrepresentation concerning a material fact; (b) which (1) the defendant either knew was false when made, or (2) was made recklessly and without regard to its truth or falsity, or (3) was made by telling the plaintiff that the defendant had knowledge that the representation was true while not having such knowledge; (c) which the plaintiff justifiably relied upon; and (d) damage to the plaintiff proximately resulting from his reliance.'
"Ex Parte Household Retail Services, 744 So.2d at 877 (internal marks and citations omitted). The Alabama Supreme Court's answer to the question we are certifying it about whether cigarettes are unreasonably dangerous under the AEMLD may resolve the issue of whether Spain has a valid fraudulent *124 misrepresentation claim. If that Court concludes cigarettes are not unreasonably dangerous as a matter of Alabama law, we are convinced that Spain will be unable to establish Carolyn's justifiable reliance and as a result, his fraudulent misrepresentation claim will fail and his conspiracy claim should be dismissed to the extent it relies on the fraudulent misrepresentation claim. That conclusion is, of course, subject to revision if the Alabama Supreme Court tells us that the state law premises for it are mistaken."
Spain, 230 F.3d at 1310-12 (footnotes omitted; emphasis added).
The federal standard of review of a Rule 12(b)(6), Fed. R. Civ. P., motion is that:
"`The motion must be denied unless it is clear the plaintiff can prove no set of facts in support of the claims in the complaint.' [South Florida Water Management Dist. v. Montalvo, 84 F.3d 402, 406 (11th Cir.1996) ] (citation omitted).
"....
"The sufficiency of a complaint is measured by Fed.R.Civ.P. 8(a), which requires only `a short and plain statement of the claim showing that the pleader is entitled to relief.' The Supreme Court has emphasized that the Federal Rules `do not require a claimant to set out in detail the facts upon which he bases his claim.' Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993) (quotations and citations omitted). Our Circuit, interpreting the Federal Rules, has repeatedly stated that `a motion to dismiss for failure to state a claim should not be granted unless it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of his claim.' Banco Continental v. Curtiss Nat'l Bank of Miami Springs, 406 F.2d 510, 514 (5th Cir.1969) (quotations, citations, and footnote omitted); see also Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp., S.A., 711 F.2d 989, 998 (11th Cir.1983) (collecting cases). In fact, `[t]his mandate is particularly true where, as here, issues of negligence are involved.' Banco, 406 F.2d at 514."
Canadyne-Georgia Corp. v. NationsBank, N.A., 183 F.3d 1269, 1275-76 (11th Cir. 1999). "Federal Rule of Civil Procedure 9(b) requires that fraud be pleaded with specificity. The plaintiff's complaint must allege the details of the defendants allegedly fraudulent acts, when they occurred, and who engaged in them." Cooper v. Blue Cross & Blue Shield of Florida, Inc., 19 F.3d 562, 568 (11th Cir.1994). "[C]onclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." Next Century Communications Corp. v. Ellis, 318 F.3d 1023, 1025 (11th Cir.2003).
I first address when the statute of limitations began to run on Spain's negligence, wantonness, AEMLD, breach of warranty, and conspiracy claims. "The plain language of the wrongful death statute states that the personal representative may commence a wrongful death action, `provided the testator or intestate could have commenced an action for such wrongful act, omission, or negligence if it had not caused death.'" Curtis v. Quality Floors, Inc., 653 So.2d 963, 964 (Ala.1995). If the statute of limitations applicable to an action for personal injury before a person's death has not expired before that person's death, then the wrongful death statute allows two years after the death for the filing of a wrongful death action claiming that the death resulted from the same act or omission that caused the personal injury. Hall *125 v. Chi, 782 So.2d 218, 220 (Ala.2000); § 6-5-410, Ala.Code 1975.
"An action alleging negligence, wantonness, or liability under the AEMLD must be brought within two years after the cause of action accrued. See Ala. Code 1975, § 6-2-38(l). A cause of action based on warranty claims must be brought within four years after the cause of action accrued. See § 7-2-725(1), (2). A cause of action `accrues' as soon as the party in whose favor it arises is entitled to maintain an action thereon. See Garrett v. Raytheon Co., 368 So.2d 516 (Ala.1979), for an in-depth discussion of when a cause of action accrues for purposes of the statute of limitations. A party has a cause of action, and the statute of limitations begins to run, on the date the first legal injury occurs, but not necessarily from the date of the act causing the injury. See Brotherhood of Locomotive Firemen & Enginemen v. Hammett, 273 Ala. 397, 140 So.2d 832 (1962). That is, where the act complained of does not itself constitute a legal injury at the time, but the plaintiff's injury comes only as a result of, and in furtherance and subsequent development of, the act of the defendant, the cause of action `accrues,' and the statutory period of limitations begins to run, `"when, and only when, the damages are sustained."' Garrett v. Raytheon Co., supra, at 519, quoting [Kelley] v. Shropshire, 199 Ala. 602, 605, 75 So. 291, 292 (1917). At the time of the first legal injury, the period of limitations begins to run, whether or not the full amount of damages is apparent. Id.; see Stephens v. Creel, 429 So.2d 278 (Ala.1983); 51 Am.Jur.2d. § 135 (1970); Atkins v. American Motors Corp., 335 So.2d 134 (Ala.1976)."
Smith v. Medtronic, Inc., 607 So.2d 156, 159 (Ala.1992).
Thus, the two-year limitation period for a claim for injury caused by a negligent or wanton act or omission would begin to run at the date of the first legally recognizable injury resulting proximately from the particular negligent or wanton act or omission alleged and proven. Because one of the essential elements of an AEMLD action is the sale of the product, Beam v. Tramco, Inc., 655 So.2d 979, 981 (Ala.1995), the two-year limitation period for an AEMLD action does not begin until the date of the first legally recognizable injury caused by the specific product alleged and proven to have been the subject of an alleged and proven sale by the particular defendant.
"[A] cause of action for damages for injury to the person in the case of consumer goods shall accrue when the injury occurs." § 7-2-725(2), Ala.Code 1975. Consumer goods are "goods that are used or bought for use primarily for personal, family, or household purposes." § 7-9A-102(23), Ala.Code 1975. See § 7-2-103, Ala.Code 1975, and Wright v. Cutler Hammer, Inc., 358 So.2d 444 (Ala.1978). Because the very source of an implied warranty of merchantability is the sale of the goods, § 7-2-314(1), Ala.Code 1975, the four-year limitation period for a personal injury action based on an implied warranty of merchantability does not begin to run until the date of the first legally recognizable injury caused by breach of the implied warranty on the specific goods alleged and proven to have been the subject of an alleged and proven sale by the particular defendant.
In their briefs to this Court, the parties concede that addiction to nicotine is not a compensable injury. "This Court will not decide questions that are moot or that have become purely academic." Smith v. Cook, 578 So.2d 1055, 1057 (Ala.1991). Because of the parties' concession, whether nicotine addiction is a compensable injury, *126 which causes the statute of limitations to begin to run, has become a purely academic question, which we should not address. The tobacco defendants admit that "the statute of limitations began to run when [Carolyn] suffered her first tobacco-related injury" and that "that date cannot be determined based on the record." Appellees' brief, p. 9. Therefore, no statute of limitation is a valid ground for a Rule 12(b)(6) dismissal of any of Spain's negligence, wantonness, AEMLD, or breach of warranty claims.
"Liability for civil conspiracy rests upon the existence of an underlying wrong, and if the action alleged to constitute the underlying wrong provides no cause of action, then neither does the conspiracy itself." Barber v. Business Prods. Ctr., Inc., 677 So.2d 223, 228 (Ala.1996), and Jones v. BP Oil Co., 632 So.2d 435, 439 (Ala.1993). See Callens v. Jefferson County Nursing Home, 769 So.2d 273, 280 (Ala. 2000) ("A plaintiff alleging a conspiracy must have a valid underlying cause of action."); Triple J Cattle, Inc. v. Chambers, 621 So.2d 1221, 1225 (Ala.1993) ("[A] conspiracy claim must fail if the underlying act itself would not support an action."); Allied Supply Co. v. Brown, 585 So.2d 33, 36 (Ala.1991) ("[A] conspiracy itself furnishes no cause of action. The gist of the action is not the conspiracy but the underlying wrong that was allegedly committed. If the underlying cause of action is not viable, the conspiracy must also fail." (citations omitted)); contra Lawler Mobile Homes, Inc. v. Tarver, 492 So.2d 297, 305-06 (Ala.1986); Purcell Co. v. Spriggs Enters., Inc., 431 So.2d 515, 522 (Ala.1983); Snyder v. Faget, 295 Ala. 197, 201, 326 So.2d 113, 116 (1976). Consequently, the statutory period of limitation for a conspiracy claim begins to run when the statutory period of limitation for the underlying tort begins to run. Barber, supra; BP Oil Co., supra; Callens, supra; Triple J Cattle, Inc., supra; Allied Supply Co., supra. Spain's conspiracy claim is dependent on his fraudulent suppression and fraudulent misrepresentation claims. "An action for fraudulent misrepresentation [or fraudulent suppression] is subject to a two-year statute of limitations. Ala.Code 1975, § 6-2-38." Fabré v. State Farm Mut. Auto. Ins. Co., 624 So.2d 167, 168 (Ala.1993).
"Under § 6-2-3, a fraud claim accrues at the time of the discovery by the aggrieved party of the fact constituting the fraud. [Lader v. Lowder Realty Better Homes & Gardens, 512 So.2d 1331 (Ala. 1987) ]. The time of discovery of a fraud claim is the time when the party actually discovered the fraud or had facts that, upon closer examination, would have led to the discovery of the fraud. Lader. `[F]raud is discovered as a matter of law... when one receives documents that would put one on such notice that the fraud reasonably should be discovered.' Hickox v. Stover, 551 So.2d 259, 262 (Ala.1989)."
Gray v. Liberty Nat'l Life Ins. Co., 623 So.2d 1156, 1159 (Ala.1993) (emphasis added).
The record presented to this Court does not contain any information on when Carolyn discovered or when she should have discovered the tobacco defendants' alleged fraudulent suppressions or fraudulent misrepresentations concerning the dangerousness of cigarettes made with tobacco contaminated or adulterated with additives during the manufacturing process. Therefore, we cannot determine the date when the statutory period of limitations began to run on these claims.
Next I address whether "the Alabama rule of repose appl[ies] in a smoking products liability case[.]" In this case, Spain's claims are grounded on the personal injuries that caused Carolyn's death. Whether *127 the Alabama rule of repose bars a plaintiff's claims for personal injury is an issue of first impression. The principles which govern this issue, however, are well settled.
"Since McArthur v. Carrie's Admr., 32 Ala. 75 (1858), this State has followed a rule of repose, or rule of prescription, of 20 years. This principle of repose or prescription is similar to a statute of limitations, but not dependent upon one, and broader in scope. Scott v. Scott, 202 Ala. 244, 80 So. 82 (1918); Patterson v. Weaver, 216 Ala. 686, 114 So. 301 (1927). It is a doctrine that operates in addition to laches. Unlike laches, however, the only element of the rule of repose is time. It is not affected by the circumstances of the situation, by personal disabilities, or by whether prejudice has resulted or evidence obscured. Wilkerson v. Wilkerson, 230 Ala. 567, 161 So. 820 (1935); 30A C.J.S., Equity § 113 (1965), at p. 33. It operates as an absolute bar to claims that are unasserted for 20 years. Roach v. Cox, 160 Ala. 425, 49 So. 578 (1909). The rationale for this absolute bar to such actions was set forth in Snodgrass v. Snodgrass, 176 Ala. 276, 58 So. 201 (1912), as follows:
"`As a matter of public policy, and for the repose of society, it has long been the settled policy of this state, as of others, that antiquated demands will not be considered by the courts, and that, without regard to any statute of limitations, there must be a time beyond which human transactions will not be inquired into. It is settled that, after a period of 20 years, without any payment, settlement, or other recognition of liability, mortgages and liens will be presumed to have been paid, settlements will be presumed to have been made by administrators, trustees, agents, and other persons occupying fiduciary positions. It is necessary for the peace and security of society that there should be an end of litigation, and it is inequitable to allow those who have slept upon their rights for a period of 20 years, after they might have demanded an accounting, and after, as is generally the case, the memory of transactions has faded and parties and witnesses passed away, to demand an accounting. The consensus of opinion in the present day is that such presumption is conclusive, and the period of 20 years, without some distinct act in recognition of the trust, a complete bar; and, as said in an early case, "the presumption rests not only on the want of diligence in asserting rights, but on the higher ground that it is necessary to suppress frauds, to avoid long dormant claims, which, it has been said, have often more of cruelty than of justice in them, that it conduces to peace of society and the happiness of families, `and relieves courts from the necessity of adjudicating rights so obscured by the lapse of time and the accidents of life that the attainment of truth and justice is next to impossible.'" Harrison et al. v. Heflin, Adm'r, et al., 54 Ala. 552, 563, 564 [ (1875) ]; Greenlees' Adm'r v. Greenlees et al., 62 Ala. 330 [ (1878) ]; Nettles v. Nettles, 67 Ala. 599, 602 [(1880) ]; Garrett v. Garrett, 69 Ala. 429, 430 [ (1881) ]; Semple v. Glenn, 91 Ala. 245, 260, ... 9 South. 265, 24 Am.St.Rep. 929 [ (1891) ]; Roach v. Cox, 160 Ala. 425, 427, 49 South. 578, 135 Am.St.Rep. 107 [ (1909) ].' (Emphasis [not] supplied.) Snodgrass, at 176 Ala. 280, 281, 58 So. 201.
"The rule of repose or prescription is a defensive matter similar to, but broader than, a statute of limitation. Wilkerson, supra; Patterson, supra; 30A *128 C.J.S., Equity § 113, at p. 33. Thus, it is unlike adverse possession, which affirmatively establishes title. The rule of repose has been described as `... a rule of property in this state, [and] tends to the repose of society, and the quieting of litigation.' Spencer v. Hurd, 201 Ala. 269, 270, 77 So. 683, 684 (1918).
"The only circumstance that will stay the running of the 20-year period of repose is a recognition of the existence of the claimant's right by the party defending against the claim. Eatman v. Goodson, 262 Ala. 242, 78 So.2d 625 (1954); Hendley v. First National Bank of Huntsville, 235 Ala. 664, 180 So. 667 (1937); 30A C.J.S., Equity § 113, at p. 33, and n. 24. ...
"....
"Recently, in Lankford v. Sullivan, Long & Hagerty, 416 So.2d 996 (Ala. 1982), this Court struck down, as unconstitutional, a statutorily imposed 10-year rule of repose. Our holding today in no way conflicts with Lankford. The 20-year rule of repose applied here differs materially from the stricken 10-year rule (Code 1975, § 6-5-502(c)). For example, the 20-year common law rule is couched in terms of the `running of the period against claims,' `absolute bar to unasserted claims,' `lack of diligence in asserting rights,' `sleeping upon their rights,' etc. The voided statute, on the other hand, sought to commence the running of the 10-year period from some arbitrary date unrelated in point of time to the accrual of a cause of action or the prior existence of a viable and cognizable claim. The fact that the common law rule is premised upon the pre-existing right to assert a claim is demonstrated in Duncan v. Johnson, 338 So.2d 1243 (Ala.1976), in which the Court refused to apply the 20-year bar against remaindermen."
Boshell v. Keith, 418 So.2d 89, 91-92 (1982) (emphasis added).
In Duncan v. Johnson, 338 So.2d 1243 (Ala.1976), this Court held:
"Twenty-two years transpired between the sale of the land for division and the institution of [the] instant case, and appellants-respondents rely heavily upon prescription, a rule of repose, as a bar to the action. In Bass v. Bass, 88 Ala. 408, [412,] 7 So. 243[, 244] (1889) the court stated tersely through Stone, C.J.:
"`It is certainly the general rule, that neither a statutory bar, nor prescription [rule of repose] runs against a remainder-man, until the termination of the estate of the life-tenant. There must be a right to sue, before the bar begins to run.'
"The general inapplicability of the doctrine of prescription [rule of repose] to estates in reversion or remainder has been uniformly observed. Dallas Compress Co. v. Smith, 190 Ala. 423, 67 So. 289 (1914); Kidd v. Browne, 200 Ala. 299, 76 So. 65 (1917); Kyser v. McGlinn, 207 Ala. 82, 92 So. 13 (1921). Cases such as Wilkerson v. Wilkerson, 230 Ala. 567, 161 So. 820 (1935), not involving contests between remaindermen and life tenants or tenants per autre vie are inapposite."
338 So.2d at 1253 (emphasis added). E.g., Harkins & Co. v. Lewis, 535 So.2d 104, 116 (Ala.1988); McDurmont v. Crenshaw, 489 So.2d 550, 553 (Ala.1986); Scotch v. Hurst, 437 So.2d 497, 502 (Ala.1983). For the purposes of the rule of repose, a "claim," Boshell, 418 So.2d at 92, is synonymous with "`a right to sue,'" Duncan, 338 So.2d at 1253 (quoting Bass v. Bass, 88 Ala. 408, 412, 7 So. 243, 244 (1890)). A person who sustains a personal injury has a right to sue "on the date the first legal injury occurs, but not necessarily [on] the date of the act causing the injury." Medtronic, *129 Inc., 607 So.2d at 159. Because a right to sue does not accrue and therefore the rule of repose does not begin to run in a personal injury action until the plaintiff or the plaintiff's decedent sustains an injury as a consequence of the defendant's breach of duty, the rule of repose is superfluous to the two-year statute of limitations for actions based on negligence, wantonness, or AEMLD and the four-year statute of limitations for actions based on breach of warranty.[5] These statutes of limitations, which begin running only upon first consequential personal injury, would bar an action long before the rule of repose, which likewise begins running only upon first consequential personal injury, would bar the action. The rule of repose could, however, bar a fraud action before it would be barred by the two-year statutes of limitations for fraud actions, § 6-2-38(l) and § 6-2-3, which do not begin to run until the plaintiff discovers, or should discover, the fraud, § 6-2-3; for the plaintiff's lack of discovery or notice of the existence of the claim does not prevent the running of the 20-year period of the rule of repose, Moore v. Liberty Nat'l Life Ins. Co., 267 F.3d 1209 (11th Cir.2001), Ex parte Liberty Nat'l Life Ins. Co., 825 So.2d 758, 764 n. 2 (2002), Ballenger v. Liberty Nat'l Life Ins. Co., 271 Ala. 318, 322, 123 So.2d 166, 169 (1960), and Merrill v. Merrill, 260 Ala. 408, 411, 71 So.2d 44, 45-46 (1954), which begins running as soon as all of the essential elements of the fraud claim so coexist that the plaintiff could file the action. See Boshell and Duncan, supra.
I next address whether, "[b]efore the appearance of federally mandated warning labels on cigarette packages, ... cigarettes [were] `unreasonably dangerous' under the AEMLD[.]"
"In Atkins v. American Motors Corp., 335 So.2d 134 (Ala.1976), this Court set out the elements of the AEMLD. In order to establish liability under the AEMLD, a plaintiff must show the following:
"`(1) [that] he suffered injury or damages to himself or his property by one who sold a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer, if
"`(a) the seller is engaged in the business of selling such a product, and
"`(b) it is expected to, and did, reach the user or consumer without substantial change in the condition in which it was sold.'
"Atkins, 335 So.2d at 141. Stated differently, a defendant will be liable under the AEMLD if it manufactures, designs, or sells an unreasonably dangerous product that reaches the consumer substantially unaltered and, because of its unreasonably dangerous condition, injures *130 the consumer when put to its intended use. Under the AEMLD, therefore, a defective product is one that is unreasonably dangerous, i.e., one that is not fit for its intended purpose or that does not meet the reasonable expectations of the ordinary consumer. Casrell v. Altec Industries, Inc., 335 So.2d 128, 133 (Ala.1976); Entrekin v. Atlantic Richfield Co., 519 So.2d 447 (Ala.1987)."
Beam, 655 So.2d at 981 (emphasis added). As a general rule, "[t]he question whether a product is `unreasonably dangerous' is for the trier of fact, just as a question of negligence is. Casrell, [335 So.2d at] 133." Yamaha Motor Co. v. Thornton, 579 So.2d 619, 621 (Ala.1991). The ubiquitous centuries-old tradition of acceptance of tobacco as a consumable product, however, requires an exception for tobacco in its traditional uncontaminated and unadulterated state.
"This Court has adopted the `reasonable expectations' test for determining if food is unmerchantable or unreasonably dangerous. Cain [v. Sheraton Perimeter Park S. Hotel, 592 So.2d 218, 221 (Ala.1991)]; [Ex parte] Morrison's [Cafeteria of Montgomery, Inc., 431 So.2d 975, 978 (Ala.1983)]. Under this test, the pivotal issue is what is reasonably expected by the consumer in the food as served, and the `[n]aturalness of the substance to any ingredients in the food served is important only in determining whether the consumer may reasonably expect to find such substance in the particular type of dish or style of food served.' Morrison's, 431 So.2d at 978 (quoting Zabner v. Howard Johnson's, Inc., 201 So.2d 824, 826 (Fla.Dist.Ct. App.1967)). Because the terms `defect,' `unreasonably dangerous,' and `merchantable' all focus on the expectations of the consumer, this Court has found the reasonable expectations test to be compatible with both the AEMLD and the implied warranty of merchantability. Cain, 592 So.2d at 221. `Generally, the question of what a consumer is reasonably justified to expect to find in his food is a question for the jury, unless the court finds, as a matter of law, that the consumer would reasonably expect to find the item in his food.' Id."

Allen v. Delchamps, Inc., 624 So.2d 1065, 1068 (Ala.1993).
Uncontaminated, unadulterated tobacco does "meet the reasonable expectations of the ordinary consumer," Beam, 655 So.2d at 981, and Allen, 624 So.2d at 1068. Likewise, it is "fit for its intended purpose," Beam, 655 So.2d at 981, in the traditional sense. Therefore, as a matter of law uncontaminated, unadulterated tobacco is not an unreasonably dangerous product as contemplated by the AEMLD. Beam, supra, and Allen, supra. Accord Witherspoon v. Philip Morris, Inc., 964 F.Supp. 455, 466 (D.D.C.1997); Burton v. R.J. Reynolds Tobacco Co., 884 F.Supp. 1515, 1522 (D.Kan.1995); Hill v. R.J. Reynolds Tobacco Co., 44 F.Supp.2d 837, 842-43 (W.D.Ky.1999); Thomas v. R.J. Reynolds Tobacco Co., 11 F.Supp.2d 850, 852-53 (S.D.Miss.1998); Guilbeault v. R.J. Reynolds Tobacco Co., 84 F.Supp.2d 263, 272 (D.R.I.2000); Little v. Brown & Williamson Tobacco Corp., 243 F.Supp.2d 480, 490 (D.S.C.2001); Naegele v. R.J. Reynolds Tobacco Co., 28 Cal.4th 856, 123 Cal. Rptr.2d 61, 66, 50 P.3d 769, 772 (2002); Souders v. Philip Morris, Inc., 127 Cal. Rptr.2d 748, 755, 104 Cal.App.4th 15, 25 (Cal.Ct.App.2002); Rogers v. R.J. Reynolds Tobacco Co., 557 N.E.2d 1045, 1053 (Ind.Ct.App.1990); Grinnell v. American Tobacco Co., 883 S.W.2d 791, 799 (Tex.Ct. App.1994).
The tobacco defendants acknowledge, however, that "[p]roducts like tobacco can be `unreasonably dangerous' ... when contaminated *131 with adulterating, foreign substances." Appellees' brief, p. 30. Spain's complaint alleges that the tobacco defendants "deliberately added carcinogens and other harmful ingredients to cigarettes." Complaint, p. 28. Spain alleges also that the tobacco defendants "were aware of over forty known carcinogens in cigarettes, and continued to sell and promote the sale of cigarettes without disclosing this information." Complaint, p. 28.
"[T]he FDA itself has previously taken the position that if tobacco products were within its jurisdiction, `they would have to be removed from the market because it would be impossible to prove they were safe for their intended us[e].' Public Health Cigarette Amendments of 1971: Hearings before the Commerce Subcommittee on S. 1454, 92d Cong., 2d Sess., 239 (1972) (hereinafter 1972 Hearings) (statement of FDA Comm'r Charles Edwards). See also Cigarette Labeling and Advertising: Hearings before the House Committee on Interstate and Foreign Commerce, 88th Cong., 2d Sess., 18 (1964) (hereinafter 1964 Hearings) (statement of Dept. of Health, Education, and Welfare (HEW) Secretary Anthony Celebrezze that proposed amendments to the FDCA that would have given the FDA jurisdiction over `smoking product[s]' `might well completely outlaw at least cigarettes').
"....
"The [FDA] conceded that `tobacco products are unsafe, as that term is conventionally understood.' 61 Fed.Reg. 44412 (1996)."
FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 137-39, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (emphasis added). 42 U.S.C. § 300x-26(a)(1) makes any state's receipt of federal block grants for the prevention and treatment of substance abuse contingent upon that state making it "unlawful for any manufacturer, retailer, or distributor of tobacco products to sell or distribute any such product to any individual under the age of 18."
"Courts may take judicial notice of matters of common knowledge without suggestion of counsel ... and without proof thereof." Cullman Broadcasting Co. v. Bosley, 373 So.2d 830, 832 (Ala.1979). "[I]t is customary for courts to take judicial notice of what is or ought to be generally known." South Carolina Cotton Growers' Co-op. Ass'n v. Weil, 220 Ala. 568, 126 So. 637, 641 (1929). "[W]e take judicial notice of the rules and regulations promulgated by authority of an act of Congress." State v. Friedkin, 244 Ala. 494, 497, 14 So.2d 363, 365 (1943). See also Webb v. J.G. White Eng'g Corp., 204 Ala. 429, 435, 85 So. 729, 734 (1920) ("Congress also enacted federal Employés Compensation Act ... and we take judicial knowledge of the fact that the Employés' Compensation Commission in this act declared the employés of the United States Nitrate Plant No. 2 to be federal employés within the contemplation of the Compensation Act, and that such action of the department of government in prosecution of the war work is within the judicial knowledge of this court.").
The United States Department of Health and Human Services, Reducing Tobacco Use: A Report of the Surgeon General, Atlanta: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Chronic Disease Prevention and Health Promotion, Office on Smoking and Health, 2000, p. 182, states, in pertinent part:
"The six major cigarette manufacturers reported a pooled list of 599 ingredients that were added to the tobacco of manufactured cigarettes as of 1994. ... The American Health Foundation (1990) has pointed out the toxic potential of numerous *132 cigarette tobacco additives under expected conditions of use. Heating and burning may lead to the formation of carcinogens from some of the additives used. For instance, amino acids used as additives are known to form compounds of various elements, including genotoxic agents (known to damage DNA) and experimental carcinogens, during heating. Licorice root extract contains glycyrrhizin, and both are used as additives in cigarettes; glycyrrhizin produces carcinogenic by-products when burned. The leukemic-producing agent benezene is a component of cigarette smoke that may be formed from the combustion of many cigarette additives. ... Among representative brands manufactured in the United States but sold in France (e.g., Camel, Kent, Marlboro, and Winston), the cigarette labels indicate that between 6.2 and 10.0 percent of each cigarette is composed of additives."
42 U.S.C. § 290aa-2(b)(2) requires the Secretary of Health and Human Services to submit a report on "the addictive property of tobacco" every three years to Congress.
The additives in cigarettes vary from brand to brand.[6] The identities, combinations, and dangers of the specific additives in the cigarettes smoked by Carolyn are not developed in the record before us.
The dangerousness vel non of tobacco containing additives is a question of fact that depends upon the nature and combination of the additives and upon the process of adding the additives. Therefore, we cannot say as a matter of law that the cigarettes smoked by Carolyn were not unreasonably dangerous under the AEMLD. Witherspoon, supra; Burton, supra; Hill, supra; Thomas, supra; Guilbeault, supra; Allen, supra; Naegele, supra; Souders, supra; Rogers, supra. We cannot hold that "it is clear the plaintiff can prove no set of facts in support of the [AEMLD] claim[ ] in the complaint." Canadyne-Georgia Corp., 183 F.3d at 1272.
I address next whether, "[s]ince the appearance of federally mandated warning labels on cigarette packages, ... cigarettes [have] been `unreasonably dangerous under the AEMLD[.]"
"Under Alabama law, if a manufacturer or seller places goods on the market which are imminently dangerous when put to their intended purpose and the defendant knows or should know that the goods are dangerous when used in their customary manner, the defendant must exercise reasonable diligence to make such dangers known to the public likely to be injured by the product."
Cazalas v. Johns-Manville Sales Corp., 435 So.2d 55, 58 (Ala.1983). See King v. S.R. Smith, Inc., 578 So.2d 1285, 1287 (Ala.1991); Caudle v. Patridge, 566 So.2d 244, 247 (Ala.1990); Hawkins v. Montgomery Indus. Int'l, Inc., 536 So.2d 922, 927 (Ala.1988); Gurley v. American Honda Motor Co., 505 So.2d 358 (Ala.1987). A plaintiff is not required to plead or to prove the absence of a warning or the inadequacy of a warning to establish an AEMLD claim, Caudle, 566 So.2d at 247. Rather, the presence of an adequate warning may be part of a defendant's assumption of the risk defense, Caudle, 566 So.2d at 248 ("The three affirmative defenses available to a seller of a defective product are: 1) no causal relation; 2) assumption *133 of the risk; and 3) contributory negligence (misuse of the product)."). See Deere & Co. v. Grose, 586 So.2d 196, 199 (Ala.1991); State Farm Fire & Cas. Co. v. J.B. Plastics, Inc., 505 So.2d 1223, 1227 (Ala.1987); Dunn v. Wixom Bros., 493 So.2d 1356, 1360-61 (Ala.1986).
"`The affirmative defense of assumption of the risk requires that the defendant prove (1) that the plaintiff had knowledge of, and an appreciation of, the danger the plaintiff faced; and (2) that the plaintiff voluntarily consented to bear the risk posed by that danger. Gulf Shores Marine Indus., Inc. v. Eastburn, 719 So.2d 238, 240 (Ala.Civ.App.1998). Assumption of the risk is described as "a form of contributory negligence applicable to factual situations in which it is alleged that the plaintiff failed to exercise due care by placing himself or herself into a dangerous position with appreciation of a known risk." Cooper v. Bishop Freeman Co., 495 So.2d 559, 563 (Ala. 1986), overruled on other grounds, Burlington Northern R.R. v. Whitt, 575 So.2d 1011 (Ala.1990). This Court has held that "[a]ssumption of the risk proceeds from the injured person's actual awareness of the risk." McIsaac v. Monte Carlo Club, Inc., 587 So.2d 320, 324 (Ala.1991) (emphasis added).'
"Ex parte Potmesil, 785 So.2d 340, 343 (Ala.2000).
"With regard to assumption of the risk, `the plaintiff's state of mind is determined by [a] subjective standard.' McIsaac v. Monte Carlo Club, Inc., 587 So.2d 320, 324 (Ala.1991)."
H.R.H. Metals, Inc. v. Miller, 833 So.2d 18, 27 (Ala.2002). "With regard to the assumption of the risk defense, whether Caudle knew of and subjectively appreciated the altered handling characteristic of the truck due to the conversion is a jury question." Caudle, 566 So.2d at 248. "Both logic and law indicate that it would be unreasonable to allow a manufacturer who has warned against the hazardous, but intended, use of its product, to defeat an otherwise proper action under the AEMLD by simply showing that its product contained an `adequate warning.' To allow that would be to engage in hypocrisy." Kelly v. M. Trigg Enters., Inc., 605 So.2d 1185, 1193 (Ala.1992).
The affirmative defense of contributory negligence is both similar and dissimilar to the affirmative defense of assumption of the risk.
"A plaintiff misuses a product when he or she uses it in a manner not intended or foreseen by the manufacturer. Kelly v. M. Trigg Enterprises, Inc., 605 So.2d 1185 (Ala.1992). A plaintiff is contributorily negligent in handling a defective product when he or she fails to use reasonable care with regard to that product. Williams v. Delta International Machinery Corp., [619 So.2d 1330 (Ala.1993) ]; Harley-Davidson, Inc. v. Toomey, 521 So.2d 971 (Ala.1988)."
General Motors Corp. v. Saint, 646 So.2d 564, 568 (Ala.1994).
"To establish contributory negligence as a matter of law, a defendant ... must show that the plaintiff put himself in danger's way and that the plaintiff had a conscious appreciation of the danger at the moment the incident occurred. See H.R.H. Metals, Inc. v. Miller, 833 So.2d 18, 26 (Ala.2002). The proof required for establishing contributory negligence as a matter of law should be distinguished from an instruction given to a jury when determining whether a plaintiff has been guilty of contributory negligence. A jury determining whether a plaintiff has been guilty of contributory negligence must decide only whether the plaintiff failed *134 to exercise reasonable care. We protect against the inappropriate use of a summary judgment to establish contributory negligence as a matter of law by requiring the defendant on such a motion to establish by undisputed evidence a plaintiff's conscious appreciation of danger. H.R.H. Metals, supra."
Hannah v. Gregg, Bland & Berry, Inc., 840 So.2d 839, 860-61 (Ala.2002)(emphasis added); see H.R.H. Metals, 833 So.2d at 27-28.
The general warnings on cigarette packages do not warn of the idosyncratic dangers of additives. See 15 U.S.C. § 1333(a)(1). The adequacy of a warning on a product as part of an assumption-of-the-risk defense is a fact issue dependent on whether the warning accurately describes the dangers posed by the particular cigarettes as contaminated or adulterated by additives. Kelly, 605 So.2d at 1193; Grose, 586 So.2d at 199; Caudle, 566 So.2d at 248; J.B. Plastics, 505 So.2d at 1227; Dunn, 493 So.2d at 1360-61. See also Hannah, 840 So.2d at 860-61, and H.R.H. Metals, Inc., 833 So.2d at 26. Thus, whether the general warnings on cigarette packages are adequate to warn a consumer of such dangers and are sufficient to prove assumption of the risk of such dangers is a question of fact for the jury. Id. Therefore, the Court cannot hold that the warning labels prove the affirmative defense of assumption of the risk as a matter of law and thereby defeat the AEMLD claim as a matter of law. Likewise, the failure of the warning labels on cigarette packages to differentiate between tobacco that has been, and tobacco that has not been, made unreasonably dangerous by additives prevents the warning labels from warranting any conclusion as a matter of law that Carolyn "had a conscious appreciation of the danger at the moment[s]" she was smoking the cigarettes; and therefore this failure in the warning labels forecloses any holding by the Court that the affirmative defense of contributory negligence defeats the AEMLD claims as a matter of law. H.R.H. Metals, supra.
I accept the invitation of the Eleventh Circuit to address whether it incorrectly concluded that negligence and wantonness claims merge into an AEMLD claim. Negligence, wantonness, and AEMLD are analytically distinct causes of action. Each of these theories of relief consists of its own essential elements in a combination that is separate and distinct from the combination of essential elements of each of the other theories. "`The elements for recovery under a negligence theory are: (1) duty, (2) breach of duty, (3) proximate cause, and (4) injury.'" Yamaha Motor Co., 579 So.2d at 623.
"`"Wantonness is not merely a higher degree of culpability than negligence. Negligence and wantonness, plainly and simply, are qualitatively different tort concepts of actionable culpability. Implicit in wanton willful, or reckless misconduct is an acting, with knowledge of danger, or with consciousness, that the doing or not doing of some act will likely result in injury ...."'"
Yamaha Motor Co., 579 So.2d at 623 (quoting Central Alabama Electric Coop. v. Tapley, 546 So.2d 371, 379 (Ala.1989)). The quotation from Beam, supra, recites the essential elements of an AEMLD claim. Each of the three theories requires some proof not required for the others, and each obviates some proof required by the others. For example, to prevail on a claim for negligence, the plaintiff must, of course, prove negligence, an essential element absent from an AEMLD claim, Casrell v. Altec Indus., Inc., 335 So.2d 128, 132 (Ala.1976). Conversely, to prevail on the claim for negligence, the plaintiff need *135 not prove that the defendant was a seller, as the plaintiff must prove to prevail on an AEMLD claim. Plaintiffs in Alabama proceed alternatively on all three theories to the extent that the proof will allow. Examples of such cases are: Hobart Corp. v. Scoggins, 776 So.2d 56 (Ala.2000); Ex parte Chevron Chem. Co., 720 So.2d 922 (Ala.1998); Flagstar Enters., Inc. v. Davis, 709 So.2d 1132 (Ala.1997); Halsey v. A.B. Chance Co., 695 So.2d 607 (Ala.1997); Ford Motor Corp. v. Burdeshaw, 661 So.2d 236 (Ala.1995); Mobile Infirmary v. Delchamps, 642 So.2d 954 (Ala.1994); Vines v. Beloit Corp., 631 So.2d 1003 (Ala.1994); Yarbrough v. Sears, Roebuck & Co., 628 So.2d 478 (Ala.1993); Allen v. Delchamps, Inc., 624 So.2d 1065 (Ala.1993); Kelly, supra; Savage Indus., Inc. v. Duke, 598 So.2d 856 (Ala.1992); Clark Indus., Inc. v. Home Indem. Co., 591 So.2d 458 (Ala. 1991); Grose, supra; Beech v. Outboard Marine Corp., 584 So.2d 447 (Ala.1991); Yamaha Motor Co., supra; Dunn v. Wixom Bros., 493 So.2d 1356 (Ala.1986). See also Richards v. Michelin Tire Corp., 21 F.3d 1048 (11th Cir.1994), and Reynolds v. Bridgestone/Firestone, Inc., 989 F.2d 465 (11th Cir.1993). Of course, the particular facts of a case may not warrant pleading all three theories, or the proof may not support pleadings of all three theories. See Veal v. Teleflex, Inc., 586 So.2d 188 (Ala.1991). None of the three theories, however, forecloses or subsumes either of the other two. Rather, all threenegligence, wantonness, and AEMLDare alternatively available to the extent that the evidence will prove them. Thus, under Alabama law, Spain's negligence and wantonness claims are, at this stage of the proceedings, viable alternatives to his AEMLD claim.
Next I address the conclusion by the Eleventh Circuit that "the sale of cigarettes does not violate the implied warranty of merchantability under" § 7-2-314, Ala.Code 1975. Section 7-2-314 provides:
"Unless excluded or modified (Section 7-2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."
An "implied warranty of merchantability claim requires that the plaintiff[] show that the goods were unmerchantable or unfit for the ordinary purposes for which they are used. Ala.Code 1975, § 7-2-314." Allen, 624 So.2d at 1068.
My analysis of this theory is like my analysis of the AEMLD theory. See Allen, supra. Thus, the sale of cigarettes made with uncontaminated or unadulterated tobacco does not violate the implied warranty of merchantability; but the sale of cigarettes made with tobacco contaminated or adulterated with additives does violate the implied warranty of merchantability if those additives cause the cigarettes to be "unfit for the ordinary purposes for which they are used," or to be contrary to the reasonable expectations of the consumer. Allen, 624 So.2d at 1068. See FDA v. Brown & Williamson Tobacco Corp., supra; U.S. Department of Health and Human Services, Reducing Tobacco Use: A Report of the Surgeon General, Atlanta: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Chronic Disease Prevention and Health Promotion, Office on Smoking and Health, 2000, p. 182; Restatement (Second) of Torts § 402A, comment i (1965). If, as alleged in the complaint on page 28 in paragraph 65, subparagraph c, under the heading "Manufacture of a known defective product in violation of a duty," certain cigarettes did contain "carcinogens and other harmful ingredients ... [added] to intentionally harm ... consumers, including Plaintiff" (emphasis added), then those particular *136 cigarettes were "unfit for the ordinary purposes for which they are used" and were contrary to the reasonable expectations of the consumer, Allen, 624 So.2d at 1068. Thus, to this extent, the complaint states a claim for relief recognized by Alabama law against any of the defendants who were "merchants" (as contemplated by § 7-2-314) of those particular cigarettes so constituted and sold to Carolyn or for her consumption. § 7-2-104, Ala. Code 1975. See Ex parte General Motors Corp., 769 So.2d 903, 912 (Ala.1999).
I address next the conclusion by the Eleventh Circuit that "the fraudulent suppression claim, which is a basis for Spain's conspiracy claim, is not viable under Alabama law." The opinion by the Eleventh Circuit in this case, already quoted at length in this opinion, correctly recites the essential elements of a claim for fraudulent suppression.
On the one hand, Alabama law imposes a duty to warn on a manufacturer who "places goods on the market which are imminently dangerous." King, 578 So.2d at 1287; Caudle, 566 So.2d at 247; Hawkins, 536 So.2d at 927; Gurley, 505 So.2d at 361; Cazalas, 435 So.2d at 58. Placarding, or labeling, is a common medium for warning. See, e.g., Cipollone v. Liggett Group, Inc., 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992); Gurley, supra; Purvis v. PPG Indus., Inc., 502 So.2d 714 (Ala.1987); E.R. Squibb & Sons, Inc. v. Cox, 477 So.2d 963 (Ala.1985). On the other hand, Spain's complaint does not suggest any medium of disclosure other than labeling, advertising, or promotion.
15 U.S.C. § 1334 of the Federal Cigarette Labeling and Advertising Act of 1965, as amended by the Public Health Cigarette Smoking Act of 1969, 15 U.S.C. § 1331 et seq., provides:
"(a) Additional Statements. No statement relating to smoking and health, other than the statement required by section 4 of this Act [15 U.S.C. § 1333], shall be required on any cigarette package.

"(b) State regulations. No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act." (Emphasis added.)
In Cipollone, the United States Supreme Court held that 15 U.S.C. § 1334 preempted not only statutory warning requirements but also state common-law requirements:
"Thus, on their face, these [1965 Act] provisions ... prohibit[] state and federal rulemaking bodies from mandating particular cautionary statements on cigarette labels (§ 5(a)) or in cigarette advertisements (§ 5(b)).
"....
"[W]e conclude that § 5 of the 1965 Act only pre-empted state and federal rulemaking bodies from mandating particular cautionary statements and did not pre-empt state-law damages actions.
"Compared to its predecessor in the 1965 Act, the plain language of the pre-emption provision in the 1969 Act is much broader. First, the later Act bars not simply `statement[s]' but rather, `requirement[s] or prohibitions[ ] ... imposed under State law.' Second, the later Act reaches beyond statements `in the advertising' to obligations `with respect to the advertising or promotion' of cigarettes.
"The 1969 Act worked substantial changes in the law: rewriting the label warning, banning broadcast advertising, and allowing the FTC to regulate print advertising. ...

*137 "The phrase `[n]o requirement or prohibition' sweeps broadly and suggest no distinction between positive enactments and common law; to the contrary, those words easily encompass obligations that take the form of common-law rules. As we noted in another context, `[state] regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy.' San Diego Building Trades Council v. Garmon, 359 U.S. 236, 247 (1959)."
505 U.S. at 518-21, 112 S.Ct. 2608 (emphasis added). Thus, after the effective date of the 1969 act, federal law preempted state common law governing labeling, advertising, and promotion on this subject. Id.
Therefore, no Alabama state law duty to disclose, by labeling, advertising, or promoting, the dangers of cigarettes contaminated or adulterated with additives existed after the effective date of the 1969 federal act to supply the element of duty essential to a fraudulent suppression claim. If a breach of such a duty occurred before that date and all of the other essential elements of a fraudulent deceit action, including the element of first consequent injury, materialized more than 20 years before Spain filed suit, then the rule of repose bars any fraudulent suppression claim and any conspiracy claim dependent on the fraudulent suppression claim, even if Carolyn did not discover or constructively discover her claim until less than two years before she died. Moore, supra; Ex parte Liberty Nat'l, supra; Ballenger, supra; Merrill, supra. Only if a breach of such a duty occurred before the effective date of the 1969 federal act, and the first consequential injury did not develop until less than 20 years before suit was filed, and discovery or constructive discovery did not occur until less than two years before Carolyn died, could a fraudulent suppression claim and a dependent conspiracy claim be viable. Id.; § 6-2-3; Hall v. Chi, supra; King, supra; Caudle, supra; Hawkins, supra; Gurley, supra; Cazalas, supra; Ex parte Household Retail Servs., Inc., 744 So.2d 871, 879 (Ala.1999) (stating the essential elements of a fraudulent suppression claim).
Last, I address the conclusion of the Eleventh Circuit that "if cigarettes are not unreasonably dangerous as a matter of Alabama law, the fraudulent misrepresentation claim, which is a basis for the conspiracy claim, is not viable under Alabama law." As I have already explained, I cannot agree with the categorical premise that "cigarettes are not unreasonably dangerous as a matter of law." While cigarettes made with uncontaminated, unadulterated tobacco are, as a matter of law, not unreasonably dangerous, whether cigarettes made with additives are unreasonably dangerous is a question of fact dependent on the dangerousness of the additives or combinations of additives. The record is not developed in a way that would foreclose proof that additives rendered some or all of the cigarettes smoked by Carolyn unreasonably dangerous. Because I cannot agree with the premise for the conclusion by the Eleventh Circuit, I cannot agree with the conclusion itself that "the fraudulent misrepresentation claim, which is a basis for the conspiracy claim, is not viable under Alabama law."
HARWOOD, Justice (concurring in Parts I.A., I.B., II.B., and III and dissenting from Part II.A.).
I concur in all aspects of the main opinion except that part of the opinion designated as Part "II. The Statute of *138 LimitationsA. Tort Claims." As to that aspect of the opinion, I dissent, joining in that part of the special writing of Justice Johnstone dissenting as to that aspect.
WOODALL, Justice (concurring in Part I.A. and Part III, concurring specially in Part I.B., concurring in the result in Part II.B., and dissenting from Part II.A.).
I concur fully in that part of the main opinion that holds that "Spain's negligence and wantonness claims are, at this stage of the proceedings, viable alternatives to his AEMLD claim." 872 So.2d at 106.
I concur specially in that part of the main opinion that holds that "a claim alleging breach of an implied warranty of merchantability is separate and distinct from an AEMLD claim and is viable to redress an injury caused by an unreasonably dangerous product." 872 So.2d at 111. I do so solely for the purpose of stating my understanding that that part of the main opinion holds, in effect, that, depending upon the facts, a sale of cigarettes may violate the implied warranty of merchantability under § 7-2-314, Ala.Code 1975.
I dissent from that part of the main opinion that concludes with the answer "that the statutory limitations period begins to run [as to the tort claims] at the moment a smoker recognizes that he or she has become addicted." 872 So.2d at 115. I agree with Justice Johnstone that "the two-year limitation period for a claim for injury caused by a negligent or wanton act or omission would begin to run at the date of the first legally recognizable injury resulting proximately from the particular negligent or wanton act or omission alleged and proven." 872 So.2d at 125 (Johnstone, J., concurring in part, concurring specially in part, and dissenting in part).
Finally, with regard to that part of the opinion, which holds that "any injury occurring from the breach of an implied warranty within the four-year period before Carolyn's death on August 5, 1999, would be actionable," 872 So.2d at 115, I concur in the result.
STUART, Justice (concurring in part in Part II.A. and expressing no opinion as to Parts I.A., I.B., II.B., and III).
I concur only in that portion of the opinion that states that under the factual allegations presented the statutory limitations period began to run at the time the plaintiff became addicted to cigarettes.
NOTES
[1] Effective January 15, 2003, the corporate name of Philip Morris, Inc., was changed to Philip Morris USA Inc.
[2] We also have before us a certified question from the United States Court of Appeals for the Eleventh Circuit in Tillman v. R.J. Reynolds Tobacco, 871 So.2d 28 (Ala.2003), dealing with the issue of the liability of retail sellers of cigarettes in smoking products-liability cases.
[3] See Walker v. Henderson, 275 Ala. 541, 544, 156 So.2d 633, 636 (1963), referring to "the well remembered admonition of the late and beloved Dean Albert J. Farrah, stated repeatedly in almost every lecture, that `Out of facts the law arises.'"
[4] See note 2.
[*] Retired Justice Hugh Maddox was sitting as a Justice of this Court in this case pursuant to § 12-18-10(e), Ala.Code 1975. Although he did not attend oral argument, he has reviewed the videotapes of that oral argument.
[5] The case of McArthur v. Carrie's Admr., 32 Ala. 75, 88-89, (1858), which originally adopted the rule of repose for Alabama, explains the original reason for the adoption of the rule: "In this, as in most of the States of this Union, there is a growing disposition to fix a period, beyond which human transaction shall not be open to judicial investigation, even in cases for which no statutory limitation has been provided. This period is sometimes longer, and sometimes shorter, dependent on the nature of the property, and the character of the transaction. By common consent, twenty years have been agreed on, as a time at the end of which many of the most solemn transactions will be presumed settled and closed. See 2 Story's Equity, § 1028 b." (Emphasis added.) The Court further stated that "[w]e do not wish to be understood as saying that this presumption is always conclusive. In the first instance, perhaps it never is so. In cases like the present, however, we hold that a prima-facie presumption is raised, whenever there is satisfactory proof of twenty years uninterrupted, adverse enjoyment and possession [of slaves]." McArthur, 32 Ala. at 94.
[6] On the date of this opinion, Internet Web sites operated by defendants Brown and Williamson Tobacco Corporation and Philip Morris, Inc., identified the ingredients in cigarettes manufactured by them and specifically identified the ingredients in each brand of cigarettes manufactured by them. See www.brownandwilliamson.com/SHC/ingredients and www.philipmorrisusa.com/our__products/ingredients.